[No. F003764. Fifth Dist. Aug. 6, 1985.]

MARY McCLEERY et al., Plaintiffs and Respondents, v.
CITY OF BAKERSFIELD et al., Defendants and Appellants.

1060

**COUNSEL**

Richard J. Oberholzer, City Attorney, J. Dean Rice, Deputy City Attorney, Borton, Petrini & Conron and Dennis R. Thelen for Defendants and Appellants.

James L. Faulkner for Plaintiffs and Respondents.

**OPINION**

**IVEY, J.\***—Appellants, City of Bakersfield and one of its police officers, Burton Mahan, appeal from the judgment entered against them on December 9, 1983, as modified by the trial court's remittitur entered on February 7, 1984, and consented to by respondents on February 14, 1984.

The question presented is whether the trial court should have permitted appellants to call a veteran police officer to testify as an expert with regard to numerous defense contentions.

Appellants argue that the trial court erred in refusing to allow them to call their proposed expert to attempt to qualify him, and in excluding expert testimony—which would have tended to rehabilitate appellants' witnesses and which would have assisted the trier of fact—because the testimony embraced an ultimate issue in the case and because it would usurp the jury's function of weighing credibility.

We conclude that, while the trial court's stated grounds for disallowing the alleged expert testimony were partially improper, the judgment cannot be reversed due to the failure of appellants' offer of proof in the trial court.

---

\*Assigned by the Chairperson of the Judicial Council.

FACTS

On May 16, 1979, around 11 p.m., the Bakersfield Police Department received a call reporting a man with a gun disturbing the peace. Officers Mahan and Mudryk responded to the call. Officer Mahan arrived first. He saw a female (Ward) standing in the roadway and when he drove up to her, she stated that she was the one who had called. Mahan then saw another individual and Ward told him it was Timmy McCleery, the person about whom she had called the police. McCleery walked toward Mahan at a brisk pace and made a motion to his waistband, where Mahan testified he noticed a shiny metallic object. Mahan yelled "Stop" and at the same time shot McCleery in the chest. He died as the result of the gunshot wound. When searched, McCleery did not have any weapons; his cowboy belt buckle was the shiny object. Officer Mudryk arrived shortly before Mahan shot McCleery and witnessed the events.[1]

At trial, the defense sought to introduce the expert opinion testimony of Los Angeles Police Lieutenant Charles Higbie. During Higbie's 16-year career with the Los Angeles Police Department, he investigated approximately 1,000 officer-involved shootings. He had investigatory, supervisory and instructional experience in the field of police-related shootings, and for the past several years had been in charge of the officer-related shooting division of the Los Angeles Police Department. Higbie had never qualified in another court as an expert.

Appellants' offer of proof at trial consisted of representations set forth in their trial brief and comments by their counsel in two discussions between the court and counsel outside the presence of the jury.

In their trial brief, appellants stated that: ". . . Lt. HIGBIE's proposed testimony will include the following areas:

"1. Explanation of any inconsistencies in the testimony of officers MAHAN and MUDRYK.

"2. Statistical information relative to years in service of officers involved in shootings.

"3. Statistical information relative to the location of handguns on suspects involved in officer related shootings.

---

[1]Officers Mahan's and Mudryk's trial testimony, statements, police reports and deposition testimony contained numerous inconsistencies.

"4. Opinion testimony regarding the use of deadly force by officer MA-HAN.

"5. Opinion testimony regarding the conduct of officer MUDRYK.

". . . . . . . . . . . . . . . . . . . . . . .

". . . LIEUTENANT HIGBIE will be asked questions regarding the use of force by officer MAHAN which will necessarily involve the ultimate issues of both negligence and self-defense."

In the course of the two extended discussions between the trial judge and counsel, counsel for appellants had the following comments: "Well, my expert has done nothing for 16 years but investigate officer related shootings. He is currently in charge of the division that does this. I'm not taking any police officer off the street to ask his opinion of self-defense. I'm taking someone who works just in that area. . . . [¶] If his Honor is inclined to not permit the testimony, I really do not want to waste a day and a half or so of travel time to get the person up here. . . . [¶] Many times, your Honor, in automobile accidents, you will have experts that give opinions on ultimate issues as to who caused the accident, what caused the accident. You know, it seems to me that I'm not off base asking a person who's done nothing but investigate police shootings whether or not this shooting is on policy. . . . [¶] [Going to ask him a hypothetical question] and also the fact that he has read the depositions, police reports, he's read everything that counsel and I have on this case. . . . [¶] [M]y expert, your Honor, has interviewed literally hundreds of police officers after shootings. He will testify that inconsistencies, especially of this nature, it's not unusual for this to happen, particularly when there's been no reenactment available the officer. He's been isolated. It is not at all unusual to have inconsistencies between several people that see an event. . . . [¶] . . . [H]e has certainly observed the stress that officers have at the time . . . statements [regarding shootings] are taken . . . . [¶] [Propose to call Higbie to testify that it is not uncommon in his investigations for officers to give inconsistent statements as to distances, who was present, how many shots were fired, and so forth and] [a]dditionally, I had hoped to ask him questions pertaining to ultimate issues in this case, to wit, self-defense."

The court denied defense counsel's request to admit Higbie's testimony on the grounds that: (1) Higbie's opinion that Mahan acted reasonably was "what the jury is going to be asked to decide, and that's really the sole question, I guess, before them;" (2) Higbie's opinion would have to be based on a hypothetical question containing inconsistent statements; (3) "the ultimate reason for having [Higbie testify that inconsistencies in officers'

testimonies after shootings are not unusual] is so that the jury can dispel [*sic*] the instruction that inconsistencies may be considered by them in judging . . . the credibility of a witness;" (4) the court did not think Higbie was an expert in the reasons—guilt, self-interest, bias, stress, trauma, etc.—that stories vary; (5) there would be insufficient foundation for any opinion from Higbie "showing that the officers were, in truth and in fact, telling the truth, that the reason why they gave inconsistent statements was because of the trauma of the circumstances"; (6) Higbie never had qualified as an expert in any other court; (7) the court "didn't think [Higbie] should be qualified, based on his experience"; and (8) the court did not think that an expert opinion on the "ultimate issue" as to whether Mahan "acted in self-defense or properly or within the law" would be proper "in this case, based on the showing that was made."

DISCUSSION

I.

## THE TRIAL COURT DID NOT REFUSE TO ALLOW APPELLANTS TO CALL THEIR PROPOSED EXPERT TO ATTEMPT TO QUALIFY HIM.

Defendants contend that the trial court "refused" to allow them to call Lieutenant Higbie in order to qualify him as an expert, that they were "summarily denied" this right, and that the refusal was an abuse of discretion.

The plain answer to these contentions is that they find no support in the record. There is nothing to indicate that the trial judge would have refused a request by appellants to have Higbie testify, out of the presence of the jury, with regard to his qualifications and to the matters which would be the subject of his expert testimony. The clear import of a number of the court's comments to counsel is just the opposite—that he would have welcomed an opportunity to hear from Higbie about his expertise and his proposed testimony.

In the course of the first colloquy between court and counsel—after the court had asked whether there were other cases in which opinion testimony with regard to self-defense had been allowed and whether Higbie had been qualified in other courts (the first question was not answered and the second was answered, "No") and after appellants' counsel had made the statement quoted above with regard to not wanting to bring the witness to Bakersfield, "[i]f his Honor is *inclined* [italics added] to not permit the testimony"—the court pointed out that it had received the trial brief only that morning and had not had a chance to read it entirely, that it appeared Higbie would give his opinion on the sole question before the jury, that the court did not

understand how a proper hypothetical question could be phrased and that the court, unlike counsel, did not have an overall picture of what was involved in the case. The court then asked a number of questions that, while they may have been somewhat rhetorical, certainly should have suggested to counsel for appellants that he had to expand his offer of proof.

At the conclusion of the second discussion (which took place five days after the first), the court sustained respondents' "objection to this evidence," on the ground that it would not "be proper in this case, *based on the showing that was made.*" (Italics added.) Counsel for appellants asked if the trial brief would be made part of the record and the court replied affirmatively. The court then asked, "Anything else before we adjourn?" to which appellants' counsel responded, "No, your Honor." At no time did appellants' counsel ask the court's permission to call Higbie in order to qualify him.

In *People* v. *Rocco* (1971) 21 Cal.App.3d 96 [98 Cal.Rptr. 365], a rape trial, defense counsel attempted to elicit opinion testimony of the police officer who investigated the complaint as to whether or not a rape in fact occurred. The prosecutor objected and his objection was sustained. On appeal defendant asserted that the court erred in rejecting the testimony without making an effort to determine the qualifications of the witness. The appellate court rejected this contention stating: "The burden was on appellant, if he wished to bring in opinion evidence, to establish the officer's qualifications as an expert, and the competency of opinion evidence on the matter in question. Appellant did not attempt to do so." (*Id.,* at p. 107.)

The trial court here had before it Higbie's qualifications, as set forth by appellants' counsel orally and in his trial brief. The court was not offered additional proof, in the form of Higbie's testimony or by any other means, before its ruling on Higbie's qualifications. The record does not demonstrate a "refusal" to allow appellants to call Higbie to attempt to qualify him.

## II.

### SOME OF THE COURT'S STATED GROUNDS FOR ITS DETERMINATIONS THAT HIGBIE WAS NOT A QUALIFIED EXPERT AND THAT HIS TESTIMONY WAS INADMISSIBLE WERE IMPROPER

The propriety of the court's refusal to qualify Higbie and to permit his testimony must be judged by the record before the court at the time. This is not to say that the reasons given by the trial court for finding Higbie unqualified, and his testimony inadmissible, were entirely proper.

## A. *The Court's Grounds for Determining Higbie Not Qualified.*

 "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) The court's ruling that Higbie was not qualified was based in part on the grounds that he had never been qualified previously as an expert and that the subject matter of his testimony was not appropriate in the case. Both of these grounds are erroneous, at least in part.

Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

"(b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

A court should not exclude one from testifying because he has never testified before. If this were the practice of all courts, there would be no experts. On the other hand, the court should not disregard the factor entirely. When a proposed expert has not been qualified before, the court should take a closer look at his qualifications; however, primary reliance should not be placed on the fact that this will be his first time on the witness stand. To do so would deprive the court and the parties of valuable testimony of qualified experts. And, whether or not the subject matter of an expert's testimony will be admissible in the case has nothing to do with the expert's qualifications. The only relevance of the subject matter, when reviewing an alleged expert's qualifications, is to see if the person is "an expert on the subject to which his testimony relates." (Evid. Code, § 720.)

To the extent the court utilized these two factors in determining that Higbie was not qualified, it abused its discretion. However, its findings that Higbie was not an expert in the reasons officers' stories vary, and that he was not qualified based on his experience, were proper exercises of the court's discretion "based on the showing that was made."[2]

---

[2]See part III, *infra*.

B. *The Court's Grounds for Determining Higbie's Testimony Inadmissible.*

*People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709] was filed subsequent to the filing of the briefs in this case. It has an extensive discussion regarding expert testimony and, while it involves an area of expertise not relevant to the instant case, it provides us with guidance in the matter of expert testimony in general.

In *McDonald,* the defendant was charged with and found guilty of murder with the special circumstance that the murder was committed during a robbery of the victim. (*Id.,* at p. 355.) "The victim was shot during an argument on the corner of a busy intersection during rush hour. The entire event lasted only a few minutes. Eight eyewitnesses testified; four made positive identifications in court, three made tentative identifications (ranging from having doubts about the identification to feeling it was debatable whether they could identify the perpetrator) and one was positive McDonald was *not* the perpetrator. Of the four witnesses who made positive in-court identifications, three admitted their view was obscured by parked and moving cars, two admitted they were frightened at the time of the incident and one testified she deliberately kept her eyes averted from the perpetrator because of fear. None of the witnesses made a positive identification during the pretrial photographic lineup. No other evidence connecting McDonald to the crime was presented by the prosecution.

"McDonald presented six witnesses who testified he was in Saraland, Alabama, visiting relatives at the time of the shooting. Various aspects of the witnesses' testimony was corroborated by cards sent by McDonald and telephone records." (*People* v. *Jackson* (1985) 164 Cal.App.3d 224, 243 [210 Cal.Rptr. 680].)

Defense counsel moved to admit the testimony of Dr. Shomer, an expert on the psychological factors that may affect the accuracy of eyewitness identification. (*People* v. *McDonald, supra,* 37 Cal.3d at p. 361.) Dr. Shomer was not going to offer an opinion that any particular witness was or was not mistaken in his or her identification. (*Id.,* at p. 362.) The People objected to the testimony because it would " 'usurp the jury's function.' " (*Ibid.*) The trial court agreed with the People. (*Id.,* at p. 363.)

The Supreme Court reversed. Noting the recent upsurge in impressive studies regarding eyewitness identifications (*id.,* at pp. 364-365), the court stated that the expert was not being called to testify to another's capacity but to inform the jury of factors that may impair the accuracy of eyewitness identification (*id.,* at p. 366), and that the phrase in Evidence Code section 801 limiting expert testimony to subjects " 'sufficiently beyond common

experience'" does not require that the jury be wholly ignorant of the subject matter of the opinion. (*Id.*, at p. 367.) "It will be excluded only when it would add nothing at all to the jury's common fund of information." (*Ibid.*)

The court further stated that those cases which have rejected expert testimony to impeach a witness are not applicable in cases where the testimony does not attack the truth-telling ability of the witness (*id.*, at p. 370) and that the trial court's ruling that expert evidence on eyewitness identification will usurp the jury's function is "'a mere bit of empty rhetoric.'" (*Ibid.*) ". . . The expert testimony in question does *not* seek to take over the jury's task of judging credibility: as explained above, it does not tell the jury that any particular witness is or is not truthful or accurate in his identification of the defendant. Rather, it informs the jury of certain factors that may affect such an identification in a typical case; and to the extent that it may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness. The jurors retain both the power and the duty to judge the credibility and weight of all testimony in the case, as they are told by a standard instruction.

"Nor could such testimony in fact usurp the jury's function. As is true of all expert testimony, the jury remains free to reject it entirely after considering the expert's opinion, reasons, qualifications, and credibility. Indeed, the Penal Code commands (§ 1127b) that an instruction so informing the jury be given in any criminal trial in which expert opinion evidence is received.

"Finally, California has abandoned the 'ultimate issue' rule in any event: 'in this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact.' (*People* v. *Cole,* (1956) *supra,* 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435], and cases cited.)" (*People* v. *McDonald, supra,* 37 Cal.3d at pp. 370-371, fns. omitted.)

The court recognized that the trial court is left with a great deal of discretion when admitting expert testimony, but that this discretion is not absolute. (*Id.*, at p. 373.)

The court found that the expert was qualified; that the crucial factor in the case was eyewitness identification; that the evidence on this issue "was far from clear" (*id.*, at p. 375); and that the ruling excluding the expert testimony was unsupported by the record and by the law, and, therefore,

constituted an abuse of discretion. (*Id.,* at p. 376.) Applying the *Watson*[3] test, the court found the error reversible. "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*People* v. *McDonald, supra,* 37 Cal.3d at p. 377, fn. omitted.)

Two other recent cases, *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] and *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093 [215 Cal.Rptr. 45], recognize two areas of expertise—rape trauma syndrome and child molest syndrome, respectively—more closely related to the subject matter of some of Higbie's proposed testimony.

In *Bledsoe,* the Supreme Court held that expert testimony that the complaining witness was suffering from rape trauma syndrome is not admissible to prove that she was raped; however: ". . . In a number of the cases in which the issue [of rape trauma syndrome] has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault. [Citation.] [delay in reporting assault]; [citation] [inconsistent post-incident statements by 14-year-old incest victim]; [citation] [brief return to scene of attack to retrieve belongings]; [citations.] As a number of decisions have recognized, in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People* v. *Bledsoe, supra,* at pp. 247-248.)

In *Roscoe,* this court held that the trial court erred in admitting a psychologist's testimony diagnosing the complaining witness as a molestation victim, but added that expert testimony "based on general literature or experience as to the reluctance of molest victims, as a class, to talk to investigators," was admissible "as bona fide rebuttal." (*People* v. *Roscoe, su-*

---

[3]The test enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], requires an appellate court to determine whether it is reasonably probable that, but for the complained-of error, a result more favorable to the appellant would have resulted. Code of Civil Procedure section 475, while framed in the negative, provides the same standard with regard to reversible error in the civil field.

*pra*, at pp. 1100-1101.) ". . . [T]he expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*Id.*, at p. 1100; fn. omitted.)

Thus—in light of *McDonald, Bledsoe* and *Roscoe*—the trial court's conclusions that Higbie's opinion was going to involve "the sole question" before the jury; that Higbie's testimony, that inconsistent statements after shootings are not unusual, would cause the jurors to ignore the instruction (CALJIC No. 2.20) that they could consider inconsistencies in judging the credibility of a witness; and that Higbie's opinion on whether Mahan "acted in self-defense or properly or within the law" involved the "ultimate issue" in the case, are at the very least questionable grounds for refusing to admit the testimony. On the other hand, the court's finding there was insufficient foundation for an opinion from Higbie that the officers were telling the truth and that the reason why they made inconsistent statements was "because of the trauma of the circumstances," was a proper exercise of the court's discretion, "based on the showing that was made."[4]

It is possible Higbie could have demonstrated sufficient expertise to permit him to advise the jury as to the factors that may affect an officer's reaction when involved in a shooting, and to explain to the jury the potential effects of these factors on the officer's recollection. It is even possible that Higbie might have qualified to express an opinion on an "ultimate issue" in the case.[5]

On the first point, the sole purpose of his testimony (like that of the experts in *McDonald, Bledsoe* and *Roscoe*) would be to explain the effects of a stress-causing event on one's perceptions and recollections. The jurors would retain both the power and the duty to weigh all the testimony and to judge the credibility of the witnesses, including Higbie.

The concern of the trial court that the expert would not know if a witness was falsifying his testimony willfully would also be a concern in eyewitness identifications and in statements of complainants in sex cases; and expert testimony is not excluded in these cases. Although an eyewitness or a rape victim might not appear to have as strong a motive to falsify as a police

---

[4] See part III, *infra*.

[5] We assume, for the purpose of this discussion, that the criteria enunciated by the Supreme Court in *McDonald* and *Bledsoe* are applicable to civil cases and have retroactive application. See *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151-153 [181 Cal.Rptr. 784, 642 P.2d 1305].

officer who has killed an unarmed civilian, this would be a factor to be weighed by the jury when it determines what value to give to the testimony.

Of course, the proffered testimony in the instant case was novel—the trial court characterized appellants' efforts as "trying to plow new ground in this case"—and was not backed by extensive scientific literature and scholarly studies as was the proffered testimony in *McDonald* and *Bledsoe*. But neither was it a subject which encompassed matters within a juror's common experience.

The *Kelly-Frye*[6] rule, "that evidence based on a new scientific method of proof is admissible only on a showing that the procedure has been generally accepted as reliable in the scientific community in which it developed" (*People* v. *McDonald, supra,* at p. 372), is inapplicable in the instant case for the same reasons it was held inapplicable in *McDonald*. ". . . It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative. . . .

"Here, by contrast, no such methods are in issue. We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association . . . ." (*People* v. *McDonald, id.,* at pp. 372-373.)

With regard to Higbie's proposed expert opinion on whether Mahan acted in self-defense, the trial court's main concern appeared to be that the expert would be testifying to the "sole question" the jurors were to decide; that his opinion would "go to the ultimate issue, this ultimate issue is important and serious, and—well, I think it's the single most issue."

As the *McDonald* court noted, California abandoned long ago the "ultimate issue" rule and our law on this subject is codified in Evidence Code

[6]*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013.

section 805, which declares: "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."

It is clear from the entire record that the jurors were faced with a difficult decision. The facts presented a close question on the issues of negligence and self-defense. Respondents' counsel questioned Officers Mahan and Mudryk at length about inconsistencies in their various statements and testimony. He strongly emphasized these inconsistencies during his closing arguments, arguing that the officers gave testimony under oath that was untrue and hinting at a police coverup. Lieutenant Higbie's "expert testimony" might very well have provided a higher degree of credibility to the testimony of the officers, with the result that the jury might have reached a different verdict.[7]

Whether the jurors also found the questions to be close is difficult to say from the record. The jurors commenced deliberations following lunch on December 7, 1983. At the end of the day (4:30 p.m.) they had not reached a verdict. They were excused for the evening and recommenced deliberations at 9:30 the following morning. They returned to the courtroom with their unanimous verdict at 4 p.m. that day.

### III.

### APPELLANTS FAILED TO MAKE AN ADEQUATE OFFER OF PROOF

■ All of the foregoing notwithstanding, the fact that Higbie had investigated many hundreds of officer-involved shootings did not, in and of itself, make him an expert, nor did it make everything he might have had to say on the subject relevant.[8] In addition, the fact that the trial court excluded Higbie's testimony for the wrong reasons does not require reversal by this court.

Evidence Code section 354 (reflecting the substance of Cal. Const., art. VI, § 13) provides in pertinent part: "A verdict . . . shall not be set aside,

---

[7]It should be noted, however, that both Mahan and Mudryk also gave trial testimony at variance on material points with their testimony at their depositions. Mahan's deposition was taken on September 4, 1981, and Mudryk's on August 16, 1983—two years and three-and-a-half months and four years and three months, respectively, after the shooting. Appellants concede that Higbie would not be an expert on the factors that would explain *these* inconsistencies.

[8]In *McDonald,* the court noted: "Not all psychologists, of course, have the special knowledge, experience, or training to qualify as experts on psychological factors affecting eyewitness identification. . . . Dr. Shomer's relevant expertise was both demonstrated by defendant and impliedly conceded by the prosecution." (*People* v. *McDonald, supra,* at p. 375, fn. 22.)

nor shall the judgment . . . based thereon be reversed, by reason of the erroneous exclusion of evidence unless the [appellate] court . . . is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by . . . an offer of proof, or by any other means. . . ."

Evidence Code section 140 defines "'evidence'" to mean "testimony, writings, material objects, or other things presented to the senses . . . ."

As noted above, neither Higbie's failure to have testified previously nor appellants' attempt "to plow new ground in this case" mandated rejection of Higbie as an expert and of his testimony as potentially helpful to the jury; however, both were factors which the court could consider and together created a situation which compelled appellants to make a strong showing of Higbie's expertise and the relevancy of his testimony. This appellants failed to do.

In substance, appellants' offer of proof was that: (1) Higbie would testify that, in those shooting cases he had investigated, it was not uncommon for the officers involved to give inconsistent statements; and (2) Higbie would give his opinion that Mahan acted in self-defense.[9] Thus, appellants advised the trial court of the substance of the *facts* they intended to prove instead of the *evidence* to prove the facts.

In *United Sav. & Loan Assn.* v. *Reeder Dev. Corp.* (1976) 57 Cal.App.3d 282, the defendant asserted that the trial judge committed reversible error in excluding evidence which would have shown, among other things, knowledge by the plaintiff which would have made a notification provision of the parties' agreement inoperative.

"Reeder's offer of proof was to the effect that United had entered into written purchase and sale contracts with other buyers, both before and after the date of The Agreement between United and Reeder, which included the property subject to The Agreement; that these contracts were substantially the same as The Agreement between United and Reeder, with time-limit-condition-subsequent periods; that United followed a practice that if the buyer was doing engineering, going forward and attempting to put the package together, United would extend the deadline when the contract was to

---

[9]The "offer of proof" set forth in appellants' trial brief (see *ante*, pp. 1062-1063) fails totally to meet appellants' burden. Appellants discuss therein "areas" of Higbie's proposed testimony and "questions" he will be asked regarding the ultimate issues, with no offer of what the "evidence" would be, only vague reference to the purpose for which it was proffered and even vaguer reference to its relevance.

become absolute as long as the buyer was working in good faith to complete the transaction, and that at the end of the condition-subsequent time period, United voluntarily returned the deposited funds to the buyer and claimed no right to retain these funds.

"The trial court did not commit error in sustaining an irrelevancy objection to Reeder's offer of proof and excluding the proffered evidence. . . . Reeder's offer of proof was defective. The offer of proof did not make known to the trial court (1) the substance, (2) the purpose, and (3) the relevance of the proffered evidence that was excluded, as required by Evidence Code section 354, subdivision (a).

"The major defect was the failure of Reeder to set forth in its offer of proof the substance of the *evidence* that was being offered. . . . An offer of proof that sets forth the substance of *facts* to be proved does not comply with Evidence Code section 354, subdivision (a), since *facts* do not constitute *evidence*. The substance of evidence to be set forth in a valid offer of proof means the testimony of specific witnesses, writings, material objects, or other things presented to the senses, to be introduced to prove the existence or nonexistence of a fact in issue." (*Id.*, at pp. 293-294; fn. omitted.)

A proper offer of proof—setting forth the *evidence* to be presented through Higbie, the purpose for which such evidence was offered, its relevancy to the issues in the case, and the manner in which, and sources from which, Higbie acquired the information he would impart—would have afforded the trial judge a reliable basis on which to evaluate Higbie, his proffered testimony and whether the latter would assist the jury.[10] With such a showing, the court could have exercised its discretion with a clear understanding of what was involved in allowing Higbie to testify. The best way to have done that was through the proposed witness.[11]

This method, which was the one utilized by trial counsel in *People* v. *McDonald, supra,* 37 Cal.3d 351, and *People* v. *Bledsoe, supra,* 36 Cal.3d

[10]The fact that a qualified expert has an opinion based on proper information on a subject that is beyond common experience does not make the opinion admissible. The opinion still must "assist the trier of fact" (Evid. Code, § 801), and whether it will is within the sound discretion of the trial court. See 2 Jefferson, California Evidence Benchbook (2d ed. 1982) section 29.7, pages 1033-1034.

[11]Although Evidence Code section 354 allows the "substance, purpose, and relevance" of the evidence to be made known to the trial court "by the questions asked, an offer of proof, or by any other means," in a case involving both an untested expert and a novel theory of expert opinion, the prudent course for both court and counsel would have been to examine Higbie prior to ruling on his qualifications and on the admissibility of his testimony.

236,[12] would have given the trial court the opportunity to explore his concerns with Higbie present and under oath.

The responsibility for providing the court with the requisite offer of proof rests on the proponent of the proffered evidence and the obvious teaching of Evidence Code section 354 is that failure to meet that responsibility is fatal to an appeal based on exclusion of the evidence.

The fact that the trial court excluded Higbie's testimony for, to some extent, the wrong reasons does not avail appellants' cause. (*People* v. *Manriquez* (1976) 59 Cal.App.3d 426 [130 Cal.Rptr. 585].) In *Manriquez,* the trial court permitted a juvenile codefendant to make a " 'blanket assertion of the privilege against self-incrimination' " (*id.,* at p. 432) instead of requiring the witness to assert the privilege as to each question after having been sworn. The appellate court found that the trial court "thereby committed error. However, appellant made no offer of proof as to what the testimony of the witness would have been, and therefore the error was nonprejudicial. [Citations.]" (*Ibid.*)

The judgment is affirmed.

Franson, Acting P. J., concurred.

**WOOLPERT, J.**—I respectfully dissent.

The majority opinion carefully and fairly sets forth the problem. In doing so appellant is criticized for not making an adequate offer of proof and the trial court is criticized because a number of improper reasons were given for rejecting the expert testimony. My conclusion depends upon a different emphasis. The majority requires more in expert qualifications and an offer of proof than I think necessary under these circumstances. I applaud the idea that counsel must fully and properly inform the court of the qualifications of the expert and the proposed testimony to be heard by the jurors. This is important not only for the trial judge, but also to let the appellate court intelligently review the claimed erroneous ruling and its effect on the trial.

---

[12]In *Bledsoe,* the trial court refused defense counsel's request to hold a hearing outside of the presence of the jury to determine the admissibility of the evidence that was to be elicited from the expert. The Supreme Court noted that "in view of the novelty of the proposed evidence and the advantages a section 402 hearing affords for providing the parties an opportunity to make a full record on the issue—it might have been preferable for the court to have proceeded with such a preliminary hearing out of the jury's presence . . . ." (*Id.,* at p. 246, fn. 6.)

In this case the trial court gave considerable time to the question of admitting the proposed testimony, both on and off the record. However, the court was acting in the pre-*McDonald* era when judges were more apt than now to guard juries from disguised advice how ultimate issues should be decided. What once was mere "invasion of the jurors' province" may now be entirely proper even though the jurors may have considerable information on the subject. That eyewitness identification is weak has been a commonplace thought, but may need some expert reinforcement if criminal responsibility depends upon it. That police conduct in a dangerous arrest situation may not be entirely rational, calm and deliberate, and that police officers may have human weaknesses, such as uncertain perceptions and recollections of exciting events, may also be of common knowledge and crucial to a defense in a civil case. The majority opinion does not quarrel with this.

In this case the jurors would decide whether police officers conducted themselves reasonably in a situation few, if any, of the jurors had ever experienced. Not only was the standard of reasonable police conduct at issue, but it depended upon testimony of those who were present and took part in or observed the events. Because of statements made at the time, and later, it was important that the jurors not only judge credibility in its abstract sense, but with a sense of how the circumstances affected the "powers of observation and recollection" of those involved. (*People* v. *McDonald* (1984) 37 Cal.3d 351, 371 [208 Cal.Rptr. 236, 690 P.2d 709].)

The ultimate fact of reasonable or unreasonable conduct is a proper subject of expert opinion. An attorney may testify that an insurer acted with bad faith. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 924 [148 Cal.Rptr. 389, 582 P.2d 980].) A state employee who habitually read theft reports and conducted interviews and otherwise investigated illegal sales of water meters, could testify as an expert that the defendants "did not exercise due diligence in purchasing the water meters." (*People* v. *Cramblit* (1978) 84 Cal.App.3d 437, 446 [148 Cal.Rptr. 440].)

The *McDonald* case may not be a remarkable change in the law. "There are sound and persuasive reasons supporting this trend toward permitting admissibility more readily, rather than rigidly compelling rejection of expert testimony. It is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness." (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 646 [141 Cal.Rptr. 128, 522 P.2d 688].) In the *Brown* case it was recognized that occupational experience and practical knowledge are high on the order of grounds for qualification (our circumstances), but education or observation may be sufficient absent such experience. (*Id.*, at p. 643.) Also, of significance to our case, the court noted the usual deference to the trial court's

exercise of discretion, but added: "Indeed, the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal." (*Id.*, at p. 647.) Of course, what is "essential" is a matter of degree. In this case, as in most cases involving professional conduct, expert opinions are deemed of great importance to both the plaintiffs and defense bar.

It is entirely proper for the trial court to try to simplify the case presentation. However, "[e]vidence that is relevant to the prime theory of the defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it." (*People* v. *McDonald, supra,* 37 Cal.3d 351, 372.)

The trial court too much emphasized the "testimony on the ultimate issue" problem, letting it improperly influence his view of whether the expert was qualified. The court's concern was expressed in this fashion: "[M]y primary thinking was that this is a crucial area for the jury, and that I didn't feel that this person's testimony at this time, with his experience, should be given to the jury."

If a doctor in charge of a hospital review board had been offered in a medical malpractice case to testify concerning typical conditions in the emergency room, or of what happens throughout the hospital when "Code Blue" is sounded, qualifications would be a routine matter. "Although the trial court's function is to determine the expert's qualifications, the degree of his knowledge and the weight his testimony will carry are matters for the trier of fact and do not affect the admissibility of his evidence." (*People* v. *Cramblit, supra,* 84 Cal.App.3d 437, 447.) In this case, assuming the subject matter was proper, the qualifications were ample.

The only real question concerns the offer of proof. It was a mixed one, partly in writing and, on several occasions, oral. When shorn of all the problems of letting the jury even hear such testimony, it appears counsel and the court knew what was proposed. Plaintiffs' counsel was prepared to meet the testimony if admitted, and perhaps looked forward to a defense expert trying to humanize police officers, thus implying a somewhat lower standard of care than popularly supposed.

The sufficiency of the offer is best illustrated by reference to the court's restatement of the off-record discussions and what it thought would be the testimony and its reasons for not permitting the witness to testify. The trial court fully understood what would be the subject matter, in ultimate fact terminology. We appear to understand the nature of the testimony.

The court refused the offer because the witness would be "telling the jury . . . 'you should vote this way or that way.'" To the contrary, the offer of proof was that the witness would describe typical stress reactions of police officers whose conduct might otherwise be thought by jurors to be more deliberate, correct and credible. In the trial court's impression, this was crucial, but not a proper subject of expert testimony. The court thought the involved officers and witnesses could provide a full picture of the events, biased as some of them may seem. Though a police expert witness may also appear biased, that was a risk which appellants were willing to suffer, as would a doctor expert testifying in a medical malpractice case. It is not a reason to preclude the testimony if otherwise proper.

I do not criticize the trial judge's desire to protect the jurors from improper influences. However, "[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal, and an offer, if made, may be broad and general." (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522 [297 P.2d 428].)

The majority notes the trial court's misunderstanding of the applicable rules, and then turns to the insufficiency of the offer of proof as the reason the judgment should be affirmed. In my view, in fairness to appellants' trial counsel, considerable time was spent elaborating on both qualifications and proposed testimony, only to meet resistance to any effort to "plow new ground." Counsel then reasonably accepted the court's ruling when it appeared nothing further could be done but produce the witness. I do not believe the law required the witness to be produced for the taking of his proposed testimony. I agree with the majority that this would have been a prudent course to take. However, counsel was not compelled to produce the witness under the circumstances; in all its patience the trial court did not even hint that personal testimony could make a difference.

I would find the court's ruling to be "crucial" to the case, using the trial court's own word. Therefore, the judgment should be reversed.