[No. C056451. Third Dist. July 11, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ISAIAS SANDOVAL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

___

[*]Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV.

**COUNSEL**

John Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Marcia A. Fay, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—A jury convicted defendant Isaias Sandoval of spousal rape with force (Pen. Code, § 262, subd. (a)(1)—count one),[1] corporal injury to a spouse (§ 273.5, subd. (a)—count two), felony false imprisonment (§ 236—count three), criminal threats (§ 422—count four) and damaging a wireless communication device, a misdemeanor (§ 591.5—count five).

Sentenced to state prison for an aggregate term of six years, defendant appeals contending (1) the trial court prejudicially erred in excluding the testimony of a defense expert, (2) the trial court failed to instruct the jury to find each element true beyond a reasonable doubt, (3) Evidence Code section

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

1109 is unconstitutional, and (4) the trial court abused its discretion in allowing the prosecution to introduce evidence of prior domestic violence. We reject defendant's contentions and will affirm the judgment.

## FACTS

A.G. and defendant had been married to each other for 11 years; during the last three years they were separated. After their separation, A.G. moved to Sacramento with the children in February 2006, leaving defendant behind and not telling him where she was going. Nonetheless, defendant found her and arrived in Sacramento in May or June 2006. In September 2006, A.G. was again living with defendant and their two children.

About 9:00 a.m. on September 21, 2006, A.G. and defendant argued about defendant's lack of employment. A.G. told defendant that their relationship was not working and he needed to move out. A.G.'s testimony about what happened next differed from her earlier statements to the police.

At trial, A.G. testified that defendant asked her not to evict him, grabbing her upper arms and pushing her in the back with one hand. She did not fall down but instead threw herself to the ground so he would get scared and leave, thinking she was going to call the police. He agreed to leave but she changed her mind and did not want him to leave because he had no place to go and would end up using drugs, so she tried to call the police to report that he hit her. She used her cell phone but defendant took it and broke it. Angry, she broke the phone more. She went to the bedroom. Defendant followed A.G. into the bedroom where they had consensual sex. At first, she did not want to have sex. After he asked for forgiveness and she forgave him, they had consensual sex. She described the sex as gentle. About noon, A.G. left defendant in their apartment and ran to the complex office where she called the police. She was crying. The 911 tape was played for the jury.

A.G. admitted that she had previously reported the following to the police. Defendant threw her to the floor and hit her in the face two times with his fist. He took his belt off, made a loop with it and threatened to strangle her with it. He took her cell phone and broke it, preventing her from calling the police. He also threatened to stab her to death with a knife if she called the police. He placed a towel over her nose and mouth and pulled her underpants down. She pleaded with him to stop, telling him she did not want to have sexual intercourse, and tried to push him off. He bit her hand. She continued to struggle but he penetrated her vagina with his penis and ejaculated. She went to the bathroom. Defendant made her return to the bedroom and stay for about an hour and then told her he would leave. She called 911 from the apartment office, reporting that she could not use her cell phone because

defendant had broken it, that he had hit her, thrown her to the floor, struck her in the head, forced her to have sexual intercourse, and locked her up in a room.

At trial, A.G. denied that defendant hit her, threatened to kill her or her sister, or threatened to stab her. A.G. explained away her scratches on her hand as caused by cleaning. Although defendant bit her on the hand and back, he had done so before during sex. She bit herself on the inside of her lip and her ear injury was an old one. She had no explanation for the bruise over her right eye. She had a fingernail mark on her nose.

A.G. claimed at trial that defendant had pushed her, but only once, days before the incident on September 21. She denied that he had beaten her three years before and had threatened to hurt her if she called the police. A.G. admitted at trial that she told Ann Tran on September 26, five days after the current incident, that defendant had a history of domestic violence, and that A.G. was afraid defendant might hurt family members if released from jail. She admitted she told Tran that defendant hit her, threw her on the bed, covered her mouth with a towel and raped her, and that three years before, defendant had beaten her and threatened to hurt her if she reported it.

At trial, A.G. admitted that when she was examined at a hospital, she told a nurse practitioner and a domestic violence advocate who was present that defendant had threatened to hit her with a belt and to cut her up with a knife and threatened to kill her and her sister. She also admitted that defendant punched A.G. in the face, dragged her by her hair, grabbed her by her arms and wrists, pinched her lips together to keep her quiet, put a towel over her nose and mouth, broke her cell phone and forced her to have sexual intercourse.

About 2:00 p.m. on September 21, 2006, the apartment complex's security guard, Jose Hernandez, went to the complex office and saw A.G. She was crying. She needed an interpreter when the police arrived. She told Hernandez that she had a domestic violence problem at home. At trial, A.G. denied discussing the September 21 incident with the complex's security guard prior to the arrival of the police.

When Sacramento Deputy Sheriff Kenny Lee arrived at the apartment complex office, Hernandez interpreted for Lee and A.G. A.G. had bruising and redness on her forehead, scratches on her nose and back, redness on the inside of her leg, abrasions on her elbow and wrist and a bite mark on her hand. At her apartment, A.G. showed the officer the belt in the bathroom and broken cell phone pieces. A.G. told the officer that she was married to defendant, that they had moved from Mexico, and that she had moved the

previous year to Sacramento from the Bay Area to get away from defendant and did not tell him she was moving. Defendant found her three months before the September 21 incident and she let him move in provided that he obtain employment and assist around the house. On September 21, they argued because he had done neither and she told him to move out. She then recounted the incident.

The sexual assault examination revealed nonmotile sperm in A.G.'s vagina which was consistent with a sexual assault earlier in the day and a small tear in A.G.'s vaginal opening which was a new injury and very unusual for someone who does not report a sexual assault.

When interviewed by detectives on September 25, 2006, defendant admitted that he had argued with A.G., broke her cell phone because she was going to call the police, bit her hand and her back, and hit her once with the belt. He admitted he grabbed her, taking her to bed where they had sexual intercourse even though she said no. He claimed that she liked him to bite her. He also claimed that he had been using "crystal" the day of the incident.

On October 11, 2006, defendant's telephone call from jail to a woman named "Sonia" was monitored. He stated that the sexual abuse charge was "screwing" him up and if "she take[s] off the charges" he would not bother A.G.

On December 20, 2006, defendant's telephone call from jail was monitored. He claimed he received a letter and "she says that . . . she'll help me. That I tell her how. That she was told that she can't take away the charges." Defendant said she could help him by "not appearing at trial."

On February 5, 2007, Sonia Orozco-Gutierrez visited defendant at the jail. Defendant told her that "if they don't . . . find her this time the case will close" and "the case closes if—if she doesn't appear."

## DISCUSSION

### I.

Defendant first contends that the trial court prejudicially erred in excluding defense expert testimony on marital relationships and sex. We conclude there was no error.

*Background*

Prior to presentation of defense evidence, defense counsel sought to call Deborah Davis as an expert and the trial court conducted an Evidence Code

section 402 hearing at the prosecutor's request. Davis was a psychology professor at the University of Nevada and had taught psychology classes for 34 years. She had taught seminars pertaining to romantic relationships for 16 years, which included the topic of handling conflict. She had also published research on sex in relationships, which included research on rape and consent. She also owned Sierra Trial and Opinion Consultants, a corporation. Defense counsel offered Davis as an expert on marital relations and sex.

The prosecutor questioned Davis. Davis admitted that she had never qualified to testify in court on the topic of marital relations and sex; she had "never been asked to serve as one." She had served as a consultant on the topic in a civil case and three criminal cases, all for the defense. She had previously qualified as an expert on the topic of eyewitness accuracy and interrogations and confessions, each time for the defense. With respect to the current case, Davis had reviewed the preliminary hearing transcript and defendant's statement to the police. She planned to testify about couples, conflict and sex, and the theory colloquially referred to as "make-up sex," which she described as a "phenomena of sex being more arousing after a fight in some circumstances," as a pattern of behavior and why it occurs. She explained that the make-up sex in literature was "investigated" under other theories, that is, "attachment theory, excitation transfer theory, and so on." She planned to inform the jury about things they did not know in order to come to their own conclusions, "not to come to a conclusion [herself]."

Defense counsel argued Davis's opinion was relevant to the issue of consent and defendant and A.G.'s pattern of interaction. Defense counsel planned to ask Davis a hypothetical question about make-up sex. The prosecutor opposed Davis's testimony arguing that it was not outside the scope of common knowledge and experience and that Davis lacked expertise.

The trial court precluded the testimony, finding that the testimony would not assist the jury "in any way," that Davis's proffered testimony was not beyond the jury's common experience and not relevant to any defense since Davis stated that she was not reaching a conclusion herself and that her general testimony would not address the issue of whether defendant actually and reasonably believed that A.G. consented. The court noted that Davis had never qualified as an expert in marital relations and sex, commenting that it was "probably because" the testimony "simply would not assist the trier of fact and/or it's not necessarily beyond the common experience of the jurors." The court also noted that Davis had never interviewed defendant or A.G.

*Analysis*

Defendant contends that the trial court abused its discretion in excluding Davis's proffered testimony. Defendant claims the trial court's erroneous

ruling also violated his right to due process and to present a defense. (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15; *In re Martin* (1987) 44 Cal.3d 1, 29–30 [241 Cal.Rptr. 263, 744 P.2d 374]; *People v. Garcia* (2005) 134 Cal.App.4th 521, 536 [36 Cal.Rptr.3d 181].) Defendant argues that Davis was fully qualified to testify as an expert on the topics of marital relations and sex and her testimony was relevant to consent. With respect to Davis's qualifications, defendant asserts that it was undisputed that she had extensive experience. Citing *McCleery v. City of Bakersfield* (1985) 170 Cal.App.3d 1059 [216 Cal.Rptr. 852], defendant claims that the practice should not be to exclude for lack of prior testimony because there would never be any experts. With respect to the relevance of Davis's testimony, defendant cites nothing on point but argues Davis's testimony on "make-up" sex would "disabuse jurors regarding misconceptions about the likelihood of consensual sexual relations immediately after a heated and physical argument." Citing *People v. Wells* (2004) 118 Cal.App.4th 179 [12 Cal.Rptr.3d 762], he claims such testimony is analogous to expert testimony on child sexual abuse accommodation syndrome (CSAAS). (*Id.* at p. 186.) We find no error.

■ "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. . . ." (Evid. Code, § 720, subd. (a).) Expert opinion is appropriate if it is "(a) [r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) [b]ased on matter (including his special knowledge . . .) . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject . . . ." (Evid. Code, § 801.)

A trial court's determination as to whether an expert should be allowed to opine about a particular subject is reviewed on appeal for abuse of discretion. (*People v. Catlin* (2001) 26 Cal.4th 81, 131 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Mayfield* (1997) 14 Cal.4th 668, 766 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1492 [86 Cal.Rptr.2d 69].)

■ CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 [283 Cal.Rptr. 382, 812 P.2d

563].) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" (*Id.* at p. 1301.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings. In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut. Where there is no danger of jury confusion, there is simply no need for the expert testimony. [Citation.]" (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [249 Cal.Rptr. 886].)[2]

■ We reject defendant's argument that Davis's testimony is akin to CSAAS testimony. First, the evidence was not proffered to rehabilitate the complaining witness; it was offered to explain her consent and to bolster her recantation at trial. Second, the proffered evidence did not relate to any behavior of the complaining witness, subsequent to the criminal conduct, that was inconsistent with the crime. Finally, the defense identified no myth or misconception held by the jury that needed to be addressed. Defense counsel's argument was simply that not everyone may be aware of make-up sex. As the Attorney General argues, the concept of "make-up" sex was within the common knowledge and experience of the jurors, was not relevant to the issue of consent and would not have assisted the jury on the issue of consent. We conclude the proffered expert testimony would not have assisted the jury in understanding the concept of make-up consensual sex. Nor would it have assisted the jury in determining the complaining witness's credibility—the primary issue at trial. There was simply no need for expert testimony.

---

[2] Faced with the question of the admissibility of expert testimony concerning "rape trauma syndrome," *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] observed, "In a number of the cases in which the issue has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault. [Citations.] As a number of decisions have recognized, in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*Id.* at pp. 247–248, fn. omitted.) *Bledsoe* concluded that rape trauma syndrome testimony is inadmissible to prove the victim was in fact raped. (*Id.* at pp. 248–251.)

The trial court's statement that Davis had never qualified before to testify on marital relations and sex, particularly make-up sex, was simply part of the trial court's observation that the testimony would not assist the trier of fact. The trial court did not abuse its discretion in excluding Davis's testimony. Defendant's constitutional claims likewise lack merit for the reasons stated.

## II.–IV.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 16, 2008, S165601.

---

[*]See footnote, *ante*, page 994.