Filed 8/5/16  In re Allen A. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ALLEN A., a Person Coming Under the Juvenile Court Law. | B267348 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK10895 ) |
| Plaintiff and Respondent, | |
| v. | |
| A.J., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Terry T. Truong, Commissioner.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and David Michael Miller, Deputy County Counsel for Plaintiff and Respondent.

_____

A.J. (father) appeals orders of the juvenile court asserting dependency jurisdiction over seven-year-old Allen A. and removing Allen from father's custody. Among other things, father urges that the juvenile court erred by amending the dependency petition sua sponte, and sustaining allegations that father physically abused Ai.V. (mother) and failed to protect Allen from physical abuse by the paternal grandfather. We conclude that the juvenile court's orders were supported by substantial evidence, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### February 2015 Referral

Allen, born in August 2007, is the child of mother and father. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2015, when an anonymous caller reported that Allen's paternal grandfather, who cared for Allen while the parents worked, had punched Allen in the stomach. The caller did not know whether the paternal grandfather lived with the family.

DCFS interviewed each member of the family. Mother told the children's social worker (CSW) that she and father worked nights, and paternal grandfather stayed with Allen and gave him breakfast. Allen had twice reported physical discipline by paternal grandfather, most recently telling mother that paternal grandfather had punched him and pinched his arm. Mother had asked father to speak to paternal grandfather about the physical discipline, but father minimized the situation. Mother said she wanted DCFS's intervention because she felt she could not make changes at home by herself. Mother also admitted two prior incidents of domestic violence against her; she did not know if Allen witnessed either one. Mother agreed to seek counseling for Allen, but said she could not obtain it for herself because she did not know how to explain it to father.

Father denied the allegations of physical abuse by paternal grandfather and said Allen lied frequently because he had attention deficit hyperactivity disorder (ADHD). Father said Allen had never reported any physical discipline by paternal grandfather, and father felt paternal grandfather was an appropriate caregiver.

2

Allen, seven years old, spontaneously told the CSW that his grandfather had not hit him. When the CSW asked how Allen knew she wanted to ask about his grandfather, Allen said his father told him to say that. Allen then said his grandfather had punched him in the stomach and pinched his arms and legs. He said he had reported the incidents to his mother and teacher. Allen said these incidents happened "during breakfast." Allen said his grandfather tells him he is stupid and calls him a "retard" when his parents are not home.

The CSW did not interview the paternal grandfather because he said he did not speak English. Father said he had spoken to the paternal grandfather about the allegations, and paternal grandfather denied them.

The CSW reinterviewed mother in March. Mother said she had taken father off her bank account after he overdrew it; now, he was pressuring her to turn over her tax refund to him. She said that when father hit her a few years ago, she went to her parents' home and asked them to help her get a divorce, but her parents did not support her and encouraged her to return to father. Since then, father had not allowed mother to speak to her parents. Mother said she felt unsafe at home, but believed things could be better if paternal grandfather was not living with the family. Mother agreed to seek counseling.

DCFS concluded that mother had demonstrated she could keep Allen safe, and thus it closed the referral as inconclusive.

## II.

## April 2015 Referral

DCFS received a second referral on April 14, 2015, when mother was treated at a hospital for burns to both arms. Mother said father and the paternal grandfather physically restrained her and burned her arms with an iron. The police report said mother reported having a verbal argument with father, in which he insisted he should receive 100 percent custody of their son and all of the couple's money and property upon finalization of their pending divorce. Mother said when she disagreed with her husband about these issues, he became enraged. Paternal grandfather held mother down while father burned her arms with a clothes iron. Grandfather then used his left arm to try to

3

strangle mother, and father punched mother in the face and torso. When mother was able to leave the home, her father drove her to the hospital for medical treatment. Mother told the police that father had hit her many times in the past, including when she was pregnant with Allen.

Officers observed five burn marks on mother's arms, a half-inch laceration to her lower lip, and bruising on her neck. Officers searched the family home and found an iron consistent with the one mother described. Father and paternal grandfather were arrested and jailed.

A CSW interviewed mother, who was "visibly upset and emotional after the [domestic violence] incident. [Mother] frequently went into deep thought after finishing sentences describing the trauma[,] [and] CSW observed [mother] to gaze into space, eyes dilated with a fearful look on her face." Mother said father had filed for divorce following the previous child abuse investigation, and he told her that if she signed a paper giving him full legal and physical custody of Allen and all the family's money and property, he would rescind the divorce petition. When she refused, father and paternal grandfather punched, kicked, strangled, and burned her. Mother said father had hit her countless times in the past, once when she was pregnant with Allen and refused to have an abortion. On another occasion, when she asked father why her jewelry was missing from the safe deposit box, he threw Allen's bicycle at her and a kitchen trash can at the wall. Allen witnessed the latter event and was very upset.

On April 16, 2015, the criminal court issued a criminal protective order against father on behalf of mother and Allen. Pursuant to the terms of the protective order, father was required to have no contact with mother or Allen and to avoid coming within 100 yards of them. The protective order was effective for three years, i.e., until April 16, 2018.

### III.

### Petition

On April 20, 2015, DCFS filed a juvenile dependency petition, which alleged as follows:

4

a-1, b-1: Mother and father have a history of engaging in violent altercations in Allen's presence. On April 14, 2015, father was arrested for torture after repeatedly burning mother's arms with an iron. Father struck mother's face and stomach with his fists, kicked mother, and threw a bicycle at her, and he allowed the paternal grandfather to strangle, strike, and kick mother. When mother was pregnant with Allen, father struck mother's stomach. Mother failed to protect Allen, in that she allowed father to reside in the home and have unlimited access to Allen.

b-2: On prior occasions, the paternal grandfather physically abused Allen by striking him in the stomach, pinching his arms and legs, and scratching his arms. Mother and father knew of the physical abuse of Allen and failed to protect him.

## IV.

## Detention Hearing

On April 20, 2015, the juvenile court found a prima facie case for detaining Allen from father and ordered him released to mother.

The following day, DCFS advised the court that it had concerns about mother's ability to protect Allen from father, noting that mother had told the CSW she was considering giving father a second chance: "Mother stated that she does not want her child Allen to visit his father in jail and that she believes that with paternal grandfather out of the picture, the three of them, Allen, mother and father can be a family again. [¶] This is a grave concern for the department considering the violent nature of the domestic violence that father and grandfather perpetrated on mother. Mother's conflicted state is indicative of a person suffering from long term domestic violence." DCFS therefore recommended that Allen "remain released to mother but with the contingency that mother and [Allen] remain in their current confidential residence and that they do not return to the parent's original home address." The court adopted DCFS's recommendation and, on April 21, ordered Allen released to mother on the condition that mother remain in the confidential location and not have any contact with father.

# V.

## Jurisdiction/Disposition

### A.    *Jurisdiction/Disposition Report*

On April 23, 2015, mother told the CSW that paternal grandfather had called a mutual friend and said mother was framing him; the friend then called mother and said she was a bad person for sending such an old man to jail. The friend tried to persuade mother to drop the charges against father and paternal grandfather because in their culture, it was wrong to involve the police in family matters.

The CSW interviewed mother again on June 2. Mother said she and father were born in India and moved to the United States as young adults. They had an arranged marriage in 2005, and Allen was born in 2007. Mother said she had not had any recent contact with father, but his family and community members were pressuring her to drop the charges against him and paternal grandfather. She acknowledged there had been domestic violence from the beginning of her relationship with father, and said that for the past month, she had been receiving individual counseling to address domestic violence issues. When asked about her prior statements that resulted in father's and paternal grandfather's arrests, mother said all of her statements to police and DCFS had been true.

The CSW interviewed father at the detention center on June 2. He said he did not physically abuse mother; she lied and put him in jail "for nothing because she was mad that I filed for divorce." Later in the interview, father said mother burned herself with an iron at her parents' house, asserting that " 'his' iron has holes for steam and mother used a 'plain iron without holes.' " Father said that mother was not mentally stable, claiming that she tried to poison Allen in 2014, and himself and paternal grandfather in March 2015. He said mother may have been diagnosed with bipolar disorder or borderline personality, but he did not know for sure. He claimed mother beat Allen with a stick, hanger, and belt once or twice each day when Allen did not listen. Father said he asked paternal grandfather to stay with the family because he believed Allen was in danger.

On June 12, 2015, mother obtained a civil temporary restraining order (TRO) against father in favor of herself, her parents, and Allen, and a child custody and

6

visitation order that provided legal and physical custody of Allen to mother and no visitation to father. The same day, mother refused to testify against father and grandfather in criminal court, the prosecution announced it was "unable to proceed," and the criminal court granted a defense motion to dismiss the charges against them. Father and grandfather were released from jail on June 13, 2015.

Mother told the CSW she refused to testify against father and grandfather because Allen wanted to visit his father, paternal grandfather had had a heart attack and was hospitalized, and she was getting a lot of pressure from the community. Mother was unsure what her intentions were regarding her marriage.

B.     *Supplemental Reports*

On June 20, mother told the CSW that father had obtained a restraining order against her. The following day, she told the CSW that father had contacted mother's sister-in-law, urging her to tell mother to drop the DCFS case. The CSW said mother "appeared heartbroken, hurt and disappointed. Mother stated she still loves [father], but realizes that it is wrong to get back together with him and does not appear to want to."

On July 15, mother said that father was urging her (through the maternal uncle) to withdraw the DCFS case and threatening that if she did not, Allen could be taken from her.

The CSW visited father on July 22. He repeated his allegations that mother was unstable and had burned herself with an iron. Father said "the reason the [criminal] case was dismissed was because mother's allegations [were] false and the iron used to burn her has a different pattern than the iron he owns. Therefore, she is lying and the case was dismissed." He provided the CSW with a letter outlining his concerns about mother.

C.     *Hearing*

The court held a hearing on July 29, 2015. Mother testified that father had physically and emotionally abused her for nine and a half years, and that Allen had witnessed some of the abuse. She said father pulled her hair, slapped her, poked her in the eyes, and prevented her from entering the family home. Father also threw objects at mother several times, including a trash can and Allen's bicycle, and punched her in the

7

stomach when she was pregnant with Allen. Mother said father did not burn her, however: She testified that on the day father was arrested, "I put the iron . . . on my hand" because father "has told me that he will separate . . . our child from me." Mother said she had gotten the iron from her parents' house and burned herself on her hand. She claimed also to have punched herself in the face and bruised her neck.

Mother said she was still afraid that father would abuse her and was deeply concerned about Allen's safety because "somebody who is abusing me . . . can abuse my child also." Further, when Allen reported that paternal grandfather had pinched, scratched, and slapped him, father was aware of Allen's report but "did not interfere to stop" grandfather. Instead, father told mother to tell the CSW that "nothing like this happened."

Father testified that he never struck or kicked mother, never threw an object at her, and never allowed paternal grandfather to abuse mother in any way. Father said he believed that mother inflicted the burns on herself and accused him of other kinds of abuse because she had some psychological issues. He denied telling Allen to say that paternal grandfather had not hit and pinched him. Father said he had filed for divorce about two weeks before he was arrested, but that he and mother were still living together and had not argued.

Following this testimony, the court stated that it did not need to hear argument; it then amended the petition and found by a preponderance of the evidence that counts a-1, b-1, and b-2 of the petition were true as amended:

a-1, b-1: "[Father] and [mother] have a history of engaging in violent altercations in the child's presence. On prior occasions, the father struck the mother, kicked the mother, pulled the mother's hair, and threw a trash can and the child's bicycle at the mother. On a prior occasion, the father struck the mother in the stomach while the mother was pregnant with the child. The mother was unable to protect the child in that the mother allowed the father to reside in the child's home and to have unlimited access to the child. Such violent conduct on the part of the father against the mother and the

8

mother's inability to protect the child endanger the child's physical health and safety and place the child at risk of harm."

b-2: "On prior occasions, [paternal grandfather] physically abused the child by striking the child's stomach with the paternal grandfather's fist. On a prior occasion, the paternal grandfather pinched the child's arms and legs and scratched the child's arms. [Father] knew or should have known of the paternal grandfather's physical abuse of the child, and failed to protect the child. The father told the child to deny the paternal grandfather's physical abuse of the child. . . . The father's failure to protect the child endangered the child's physical health and safety and placed the child at risk of harm."

The court then stated as follows: "I have to tell you, this is a classic, classic case of domestic violence where there is a perpetrator and where there is a victim. And I don't believe anything that [father] just testified to. I have a child who has told something very, very different than what [father] testified to. And I'd just as soon believe that child than believe a grown man who has more to hide than anything." The court declared Allen a juvenile court dependent, found by clear and convincing evidence that there would be a substantial danger to Allen's safety if he were returned home to father, and ordered Allen removed from father. The court then ordered Allen placed with mother; ordered DCFS to provide family maintenance services to mother, including domestic violence counseling, parenting classes, individual counseling, and a psychological assessment; ordered father to participate in a 52-week domestic violence counseling program, parenting education, and individual counseling; and granted father one hour per week of DCFS-monitored visitation with Allen.

After hearing additional testimony, the court entered a three-year restraining order protecting mother from father, stating, "Given what this case is about, what I know of this case, I do not have any faith that [father] would leave [mother] alone except for a permanent restraining order being issued."

Father timely appealed.

9

## DISCUSSION

## I.

## The Juvenile Court Did Not Abuse Its Discretion by
## Amending Certain of the Petition's Allegations

As we have said, the juvenile court amended the petition sua sponte at the close of testimony. The words the court omitted from the original petition are interlineated below; the words the court added are italicized:

(a-1, b-1): [Allen's] father . . . and mother . . . have a history of engaging in violent altercations in the child's presence. ~~On 4/14/2015, the father repeatedly burned the mother's arms with an iron, inflicting burn marks on the mother's arms requiring medical treatment.~~ *On prior occasions,* the father struck the mother,~~'s face and stomach, with the father's fists. The father~~ kicked the mother, *pulled the mother's hair,* ~~The father allowed the paternal grandfather . . . to strangle, strike and kick the mother. On prior occasions, the father struck, kicked, choked~~ and threw *a trash can and* the child's bicycle at the mother. On a prior occasion, the father struck the mother's stomach, while the mother was pregnant with the child. The mother *was unable to* ~~failed to~~ protect the child, in that the mother allowed the father to reside in the child's home and to have unlimited access to the child. ~~On 4/14/2015, the father was arrested for Torture.~~ Such violent conduct on the part of the father against the mother*,* and the mother's *inability* ~~failure~~ to protect the child, endanger the child's physical health and safety and place the child at risk of ~~serious physical~~ harm. ~~damage and failure to protect.~~

(b-2): On prior occasions, [the paternal grandfather] physically abused the child by striking the child's stomach with the paternal grandfather's fists. On a prior occasion, the paternal grandfather pinched the child's arms and legs, and scratched the child's arm. ~~inflicting marks to the child's arms and legs. Such physical abuse was excessive and caused the child to suffer unreasonable pain and suffering. [Mother] and~~ [Father] knew *or should have known* of the paternal grandfather's physical abuse of the child and failed to protect the child. ~~The father told the child to deny the paternal grandfather's physical abuse of the child.~~ The paternal grandfather's physical abuse of the child and the ~~parents'~~

*father's* failure to protect the child, endanger the child's physical health and safety and place the child at risk of ~~serious physical~~ harm. ~~damage, physical abuse, and failure to protect.~~

Father contends that the juvenile court's amendments to the petition violated his right to due process because "the specific factual allegations of the petition the juvenile court found to be true did not exist until after the close of evidence." As a result, he urges, he was denied a full and fair hearing.

We note as an initial matter that father did not object to the amendments at the jurisdiction/disposition hearing. To the contrary, when asked after the court's ruling whether he wished to raise any other issues, father's counsel merely asked that Allen be placed with father. Because father did not raise a due process challenge in the juvenile court, he may not raise it on appeal. (E.g., *In re Brian K.* (2002) 103 Cal.App.4th 39, 42 [failure to raise due process challenge in the juvenile court forfeited the issue on appeal]; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 836 ["where the parent chooses not to contest the amendments, the parent waives the right to complain of the issue on appeal."].)

On the merits, we find no due process violation. "[Welfare and Institutions Code] [s]ection 348 provides that provisions in the Code of Civil Procedure relating to variance and amendment of pleadings in civil actions apply to juvenile dependency petitions and proceedings. Amendments to conform to proof are permitted, but material amendments that mislead a party to its prejudice are not allowed. (Code Civ. Proc., §§ 469-470.)" (*In re Andrew L.* (2011) 192 Cal.App.4th 683, 688-689.)

"Given the haste with which petitions are sometimes drafted, and section 332's statement that only a 'concise statement of facts is required,' the ability to amend according to proof plays an important role in the overall dependency scheme. If a variance between pleading and proof—to use the traditional term of art from the civil law (see 5 Witkin, Cal. Procedure (4th ed. 1997) Pleadings, § 1141, pp. 596-597)—is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment. [Footnote omitted.] [¶] The basic rule from civil

11

law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041-1042.)

On facts similar to those of the present case, courts have held that juvenile courts must permit amendment to conform to proof, and, indeed, that failing to permit such amendment may be an abuse of discretion. In *In re Jessica C.*, *supra*, 93 Cal.App.4th 1027, the petition alleged that a child's father had "penetrated his daughter's vagina with his penis," but the child's testimony at the jurisdiction hearing was that her father "touched her vagina with his penis." The juvenile court denied county counsel's request to amend the petition by substituting "touching" for "penetrating." (*Id.* at p. 1040.) The Court of Appeal held that the failure to allow the amendment was an abuse of discretion: "Here, it cannot be seriously maintained that [father] would possibly have prepared his defense differently if the allegation had been that he had 'touched' his daughter's vagina with his penis, as distinct from 'penetrated.' The basic allegation was there, and any variance between 'touching' and 'penetrating' could not have misled him to his detriment. Both allegations are heinous, and entail the intimate violation of a child. [¶] On the other hand, the *refusal* to allow an amendment according to proof was prejudicial to the minors. [¶] . . . As things now stand, for example, there has been no finding of 'severe sexual abuse,' as defined in section 361.5, subdivision (b)(6) (severe sexual abuse includes 'genital-genital . . . contact'), which can result in a total denial of reunification services. By not allowing the amendment, the trial court avoided consideration of a question that directly implicates future services." (*Id.* at p. 1042.)

In the present case, the original petition alleged that father physically abused mother by burning her with an iron, striking her face and stomach, kicking her, choking her, and throwing a bicycle at her; the amended petition omitted several of the specific allegations of abuse and added that father pulled mother's hair and threw a trash can at her. With regard to paternal grandfather, the original petition alleged that his physical abuse of Allen "inflict[ed] marks to" his arms and legs and caused him to suffer

12

unreasonable pain and suffering; the amended petition omitted these allegations and added that father knew *or had reason to know* of the paternal grandfather's excessive physical discipline. None of the amendments introduced a different theory of dependency, and none misled father to his prejudice.[1] On these facts, the juvenile court did not abuse its discretion by amending the petition.

Father contends finally that even if the juvenile court had the authority to amend the petition to conform to proof, it abused its discretion by doing so sua sponte. The only authorities father cites for this proposition, however, say generally that a judge should be "impartial" and avoid "act[ing] as an advocate for the opposing party." While we do not doubt these general principles, father has not shown that they have any application to the issue before us: a juvenile court's authority to amend a dependency petition to conform to proof. The contention therefore is forfeited. (E.g., *Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 ["When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited."].)[2] In any event, reviewing courts have rejected similar claims to hold that a juvenile court may properly rely on events not alleged in an original petition so long as such events do not assert an additional basis for jurisdiction. (E.g., *In re K.S.* (2016) 244 Cal.App.4th 327, 339.)[3]

---

[1]     On the other hand, had the juvenile court dismissed rather than amended the petition, as father suggests it should have done, the court would have avoided consideration of questions directly implicating the court's dependency jurisdiction—namely, whether father had physically abused mother and failed to protect Allen from grandfather's excessive physical discipline.

[2]     Father also fails to cite authority for the proposition that the juvenile court was required to hear argument before making findings on the petition; this contention, too, therefore is forfeited. In any event, case law is clear that "[t]he decision to listen to oral argument . . . *is within the discretion of the court. . . .* (*In re Marriage of Lemen* (1980) 113 Cal.App.3d 769, 784; *Muller v. Muller* (1956) 141 Cal.App.2d 722, 731.)" (*Wilburn v. Oakland Hospital* (1989) 213 Cal.App.3d 1107, 1111, italics added.)

[3]     We are perplexed by father's citation of *In re Andrew L.*, *supra*, 192 Cal.App.4th 683, in which the Court of Appeal held that the juvenile court did not abuse its discretion

13

## II.

## The Jurisdictional Findings and Order

## Were Supported by Substantial Evidence

Father contends there was insufficient evidence to support the juvenile court's conclusion that Allen was a child described by Welfare and Institutions Code section 300, subdivisions (a) and (b).[4] For the reasons that follow, we do not agree.

### A.    *Legal Standards*

"In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is ' "[s]ubstantial" ' if it is reasonable, credible and of solid value. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)  The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order.  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.)" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Section 300, subdivision (a) authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent."  Jurisdiction under section 300, subdivision (b) requires proof that a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

by striking allegations of the petition at a six month review hearing at the request of the San Diego County Health and Human Services Agency based on new information. Father does not suggest any parallels between *Andrew L.* and the present case, and we do not perceive any.

[4]    All subsequent statutory references are to the Welfare and Institutions Code.

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 824), the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135; *In re Troy D*. (1989) 215 Cal.App.3d 889, 899-900.) A parent's past conduct is a good predictor of future behavior. (*In re Petra B*. (1989) 216 Cal.App.3d 1163, 1169-1170.)" (*In re T.V*., *supra*, 217 Cal.App.4th at p. 133.)

B. *Domestic Violence*

Exposure to domestic violence between the parents may support jurisdiction under subdivision (a) or (b) of section 300 because "the cycle of violence between [a child's] parents [may] constitute[] a failure to protect [the child] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' (*In re Heather A*. [(1996)] 52 Cal.App.4th [183,] 194; see *In re Sylvia R*. (1997) 55 Cal.App.4th 559, 562 [children suffer secondary abuse from witnessing violent confrontations].)" (*In re T.V*., *supra*, 217 Cal.App.4th at p. 135; see also *In re Giovanni F*. (2010) 184 Cal.App.4th 594, 598-959; *In re Heather A*., *supra*, 52 Cal.App.4th at p. 194.) The application of these sections is appropriate "when, through exposure to a parent's domestic violence, a child suffers, or is at substantial risk of suffering, serious physical harm inflicted nonaccidentally by the parent." (*In re Giovanni F*., at pp. 598-959.) The child need not have been actually harmed in order for the court to assume jurisdiction. (*Id*. at pp. 597-598.) " 'Both common sense and expert opinion indicate spousal abuse is detrimental to children.' " (*In re E.B*. (2010) 184 Cal.App.4th 568, 576; see also *In re R.C*. (2012) 210 Cal.App.4th 930, 941-942 [" 'Children can be "put in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg. . . ." ' "].)

Father appears to concede that domestic violence between mother and father may give rise to dependency jurisdiction under section 300, subdivisions (a) and (b). He also

concedes, as he must, that mother testified to a history of physical abuse by father, and that credibility findings are within the province of the dependency court. Father urges, however, that it was not reasonable for the court "to conclude (as it apparently did) that mother burned herself with an iron, filed a false police report that saw father and the paternal grandfather wrongly jailed for eight weeks, but that her otherwise uncorroborated testimony regarding less serious allegations against father were true."

As an initial matter, we do not agree with father that because the juvenile court struck the torture allegations from the petition, it "apparently" concluded that mother burned herself with an iron and filed a false police report. To the contrary, the juvenile court's statements that it was rejecting the entirety of father's testimony as not credible and that "this is a classic . . . case of domestic violence" suggest that the court believed that father—not mother—was responsible for mother's severe injuries in April 2015. Such conclusion was supported by substantial evidence—namely, mother's statements to the police and social workers that father and paternal grandfather had injured her, mother's injuries as observed by police officers at the hospital, the CSW's observations that mother was "visibly upset and emotional" when describing the April 2015 domestic violence incident, and mother's repeated statements to DCFS that she was being pressured by father and her community to recant her testimony.

Nor do we agree with father that the juvenile court was required to conclude that mother's April 2015 injuries were self-inflicted because mother so testified at the jurisdiction hearing. Our Supreme Court has recognized a large body of social science literature describing the tendency of abused spouses to deny and minimize violence perpetrated against them. As the court has explained, " 'A fundamental difference between family violence and other forms of violence (such as street violence) is that family violence occurs within ongoing relationships that are expected to be protective, supportive, and nurturing. The ties between victim and victimizer often are the strongest emotional bonds, and victims frequently feel a sense of loyalty to their abusers. . . ." (*People v. Brown* (2004) 33 Cal.4th 892, 899.) As a result, " 'even a victim who reports an abusive family member to police may later protect the person by denying, minimizing,

16

or recanting the report.' " (*Ibid.* [held: no error in admitting expert testimony regarding "the tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in abusive relationships." (*Id.* at p. 907.)][5]; see also *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002 [expert testimony admissible " ' "to disabuse jurors of commonly held misconceptions about [domestic abuse], and to explain the emotional antecedents of [abuse victims'] seemingly self-impeaching behavior. . . ." ' "]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 902 [expert testimony "was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior"].) Accordingly, notwithstanding mother's contrary testimony at the jurisdiction hearing, the juvenile court reasonably could have concluded that mother's injuries were inflicted by father.

Finally, the juvenile court did not have to conclude that father abused mother on April 14, 2015, by burning, hitting, and strangling her in order to sustain the allegations of the petition. The amended petition alleged that prior to April 2015, father struck and kicked mother (including while she was pregnant with Allen) and threw objects at mother, including a bicycle and a trash can. These findings were supported by mother's statements to the CSW, her testimony at the jurisdiction hearing, and Allen's statement to the CSW that he saw his father throw a trash can while his parents were angry and

---

[5]     In *People v. Brown*, the Supreme Court quoted the prosecution expert's testimony as follows: "Domestic violence victims, after describing the violence to the police, often later repudiate their description. There is typically 'anywhere between 24 and 48 hours where victims will be truthful about what occurred because they're still angry, they're still scared.' But 'after they have had time to think about it . . . it is not uncommon for them to change their mind.' About 80 to 85 percent of victims 'actually recant at some point in the process.' Some victims will say they lied to the police; almost all will attempt to minimize their experience. [¶] [The expert] explained why victims of domestic violence may give conflicting statements: They may be financially dependent on the defendant. They may be pressured, or even threatened, by the defendant or other family members. They may still love the defendant and hope that things will get better." (*People v. Brown*, *supra*, 33 Cal.4th at p. 897.)

fighting. This testimony is substantial evidence of ongoing domestic violence between mother and father, creating a substantial risk of serious physical harm to Allen.

### C. *Failure to Protect Allen From Physical Abuse by Paternal Grandfather*

Substantial evidence also supported the allegation that father failed to protect Allen from physical abuse by the paternal grandfather. Allen reported to mother and his teacher that paternal grandfather had punched him in the stomach and pinched his arms and legs. Allen repeated these statements to the CSW, adding that his grandfather "calls him names like stupid and retard . . . when his parents are not home." When mother told father about grandfather's abuse, father refused to intervene; to the contrary, he told both mother and Allen to deny the allegations, and he told the CSW that Allen lied frequently. Accordingly, substantial evidence supported the juvenile court's conclusion that Allen was physically abused by paternal grandfather and that father failed to protect him from such abuse.

## III.

## Substantial Evidence Supported the Dispositional Order
## Removing Allen from Father's Custody

Father contends the evidence is insufficient to support the court's dispositional order removing Allen from his custody. He asserts that "the most serious allegations against father were revealed to be untrue" and "[t]he remaining allegations were largely based on the uncorroborated statements of mother, and could not be reasonably relied upon by the juvenile court."

Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1).) "The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. (§ 361, subd. (c)(1).) The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.

18

We review the court's dispositional findings for substantial evidence." (*In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135-136, and cases cited therein.)

Father contends there was not a current substantial risk of harm to Allen because the parents were no longer living together and were abiding by mutual stay-away orders.[6] We do not agree. " 'In evaluating risk based upon [a parent's] endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of [even] a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances.' (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026.)" (*In re John M.* (2013) 217 Cal.App.4th 410, 418-419.)

In the present case, mother and father appear to have a nearly 10-year history of domestic violence and continued to live together until father was jailed for severe physical abuse of mother. At the time of the jurisdiction/disposition hearing, their separation was still very recent. The court made a specific finding, moreover, that a permanent restraining order was necessary to avoid future abuse of mother by father, stating: "[Father] has been in custody from the time that this petition was filed up until recently in this case; so there's no chance that he could have gone anywhere near [mother] in this case. [¶] Given what the case is about, what I know of this case, I do not

---

[6]     There is no meaningful discussion in father's appellate briefs of the second prong of the section 361, subdivision (c) inquiry—i.e., whether there are reasonable means by which Allen could be protected without removing him from father's custody. Accordingly, we treat any such argument as forfeited. (*People v. Dobson* (2016) 245 Cal.App.4th 310, 320-321.)

19

have any faith that [father] would leave [mother] alone except for a permanent restraining order being issued."

In addition, up to the time of the hearing, father continued to deny any abuse of mother or of Allen, suggesting that mother had falsified claims of abuse because she had psychiatric problems, and that Allen lied about paternal grandfather's actions because he had ADHD. In short, father had shown absolutely no insight into how his past conduct endangered his child. Father also had failed to take any steps to correct or address such conduct, such as enrolling in parenting or domestic violence education. For all of these reasons, the juvenile court did not err in ordering Allen removed from father's custody.[7]

---

[7]  *In re James T.* (1987) 190 Cal.App.3d 58, on which father relies, is distinguishable. *James T.* concerned a removal order premised on section 361, subdivision (c)*(3)* (formerly subdivision (b)(3)), which permits removal of a child from a parent's custody if " '[t]he minor [is] suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others.' " (*In re James T.*, at p. 64.) In the present case, in contrast, the juvenile court ordered Allen removed from father's custody pursuant to section 361, subdivision (c)*(1)*, which permits removal if "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor." The court's conclusion in *James T.* there was insufficient evidence that James was suffering sufficiently extreme anxiety, depression, withdrawal, or aggressive behavior to justify court intervention under subdivision (c)(3) (*In re James T.*, at p. 65) therefore has no relevance to this case.

## DISPOSITION

The jurisdictional and dispositional findings and orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.

21