Filed 9/4/20  P. v. Has CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C084322 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFE20160012563) |
| v. | |
| KHYVANNARA KHMET HAS, | |
| Defendant and Appellant. | |

Defendant Khyvannara Khmet Has appeals his conviction for committing a lewd act upon a child.  (Pen. Code, § 288, subd. (a).)[1]  He contends:  (1) the trial court prejudicially erred in instructing the jury on flight, as it had no application to the facts of the case and impermissibly lightened the prosecution's burden of proof; (2) the trial court abused its discretion in allowing the prosecution's expert to testify on Child Sexual

---

[1]     Undesignated statutory references are to the Penal Code.

Abuse Accommodation Syndrome (CSAAS); (3) the trial court's denial of his request for an Evidence Code section 402 hearing and access to the victim's mental health records denied his right to effectively cross-examine the expert witness; and (4) the trial court erred in imposing a $500 fine under section 294, as that fine cannot be imposed on a conviction under section 288, subdivision (a). The People properly concede this last point regarding the fine. We will strike the fine under section 294. In all other respects, we affirm the judgment.

FACTUAL BACKGROUND

Angelina Doe's school psychiatrist diagnosed her with oppositional defiance disorder and her mental health counselor diagnosed her as bipolar. In September 2016, when Angelina was 12 years old, she and her mother got into a physical fight. As a result of the fight, Angelina walked out of the home, to a nearby park. After about 15 minutes, as she was walking through the park, she saw defendant on roller skates and he started talking to her. Defendant told her he was 27. Angelina gave defendant a fake name, told him she was 19 years old, and that she had gotten into an argument with a friend or a boyfriend. Defendant told her she had a baby face and questioned her age a few times. Nonetheless, he invited her to his friend's home and to join him on some errands. They were running errands with two other men for about an hour and then returned to the friend's house. During that time, defendant told Angelina she was cute and he wanted to kiss her stomach. After about another hour at the friend's house, Angelina and defendant walked to the park. They sat on a bench talking and defendant started rubbing her shoulders. Angelina started crying because she missed her mother and defendant kissed her, open-mouthed, on the lips. The two then played in the playground.

Defendant suggested they go to his brother's house and then to a "hang out spot." There were a number of children at defendant's brother's house who were about Angelina's age. They told him they knew her and that she was about their age. Defendant asked her again about her age and she answered she was 19. One of the kids

at the house asked to see some proof of her age. One of the older boys at the house told defendant he was going to be charged with child molestation, and another one called him a pervert.

They left the house and defendant took Angelina to the "hang out place," which was a shed behind a burned-down house. They went inside and he told her to take off her clothes and lie down. Then he kissed her on her lips, her breasts, her stomach, and her vagina. He also digitally penetrated her vagina. She told him to stop, but he did not. She started crying and he continued to digitally penetrate her. He stopped about 10 minutes later and told her to put on her clothes. She did and fell asleep. She did not touch him during this time and he did not ask her to.

Meanwhile, Angelina's mother had called law enforcement and her mother's boyfriend, Eric, had driven around the neighborhood looking for Angelina. A neighbor, Roan, told them he had heard where Angelina might be. Roan took them to the house with the shed. Angelina woke up the next afternoon, as her mother came through the door of the shed. Defendant was shirtless and his shorts were below his waist. He and Angelina were sleeping next to each other, with defendant's hand on her hip. Angelina's mother started yelling her name. As Angelina's mother came into the shed, defendant stood up quickly and pulled up his shorts. Eric came into the shed, Angelina's mother grabbed her, and defendant ran away. Eric testified he grabbed defendant and tried to push him through the back wall, but defendant struggled, got past Eric, and "took off running." Angelina's mother called the police.

Eric and Roan got into their cars to follow defendant. Defendant ran to, and across, the park. Eric stopped his truck in front of defendant and cut him off. Then Eric and defendant got into a fight as Eric tried to restrain defendant. Law enforcement officials arrived at the park and separated everyone.

When police officers arrived at the shed, Angelina refused to talk to them about what had happened. She did identify defendant at the park. While at the park to identify

3

defendant, she also stated defendant had not done anything wrong. She felt guilty for telling defendant she was 19. Because of this lie, she initially blamed herself for what happened.

Angelina asked to go to safe house[2] because she did not want to be at home. The next day, a social worker interviewed Angelina. She told the social worker that defendant had tried to touch her in the shed and she told him he should not because she was only 12 years old. A few days later, Angelina talked to Detective Bonnet at the safe house but did not tell him about the sexual assault that occurred in the shed. She told Detective Bonnet defendant had touched her leg, but nothing else.

A few weeks later, Angelina told her best friend, Diana, defendant had raped her. She told Diana that defendant had raped her because she did not understand the difference between rape and sexual assault. Then Angelina told her mother. Her mother had her talk with a woman at the Child Advocacy Center. She was still uncomfortable discussing the details of what had happened, so she repeated what she had told Detective Bonnet. At the preliminary hearing, Angelina did not testify that she was raped, orally copulated, or digitally penetrated. She testified defendant touched her inappropriately.

Angelina testified she spoke with her stepfather and told him that defendant had touched her inappropriately. Her stepfather testified Angelina told him three men had forced her into a car at gunpoint and forced her to perform oral sex. Angelina agreed to speak with Detective Bonnet again. She told the detective that defendant was one of the three men and he forced her into a car and touched her inappropriately, but she did not give specifics. Angelina later admitted to Detective Bonnet, and at trial, that she had omitted details in her earlier accounts because she was frustrated, upset, guilt-ridden, and uncomfortable talking about what happened. She told the full story at trial because she

---

[2]     A safe house is a place teenagers can stay overnight without parental supervision.

wanted the whole thing to be over, and knew if she did not, she would have to keep living with it and might become suicidal.

David Love, a licensed marriage and family therapist, testified as an expert witness on CSAAS. CSAAS is not a diagnostic tool, but an ongoing study that looks at the typical reactions of children who have been molested and describes those reactions in five separate components. These components include secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction. CSAAS is a study intended to help people understand unconventional behaviors in children who have been molested, including why they may delay in telling someone what happened, or why they may change their story. Love did not interview Angelina, read any reports, or interview anyone related to this case.

PROCEDURAL HISTORY

The prosecution filed an information that charged defendant with one count of lewd acts upon a child. (§ 288, subd. (a).) A jury found defendant guilty as charged. The trial court sentenced defendant to six years in state prison and granted him 215 days of presentence custody credit. The trial court also imposed various fines and fees, including a $500 fine under section 294.

DISCUSSION

I

*Flight Instruction*

Defendant contends the trial court prejudicially erred in instructing the jury with CALCRIM No. 372 regarding flight. He argues the instruction did not apply to the facts of the case, as he fled not to avoid arrest but because Eric was beating him.

In closing argument, the prosecution argued defendant ran from the shed because he had been caught there with a 12-year-old girl after committing lewd acts upon her. Defense counsel argued defendant fled to avoid Eric beating him.

5

Without objection,[3] the trial court instructed the jury with CALCRIM No. 372: "If the Defendant fled or tried to flee immediately after the crime was committed, or after he was accused of committing the crime, that conduct may show he was aware of his guilt. If you conclude the Defendant fled or tried to flee, it is up to you to decide what meaning and importance—what is the meaning and importance of that conduct. However, that the Defendant fled or tried to flee cannot prove guilt by itself."

"Errors in jury instructions are questions of law, which we review de novo." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 358.) A flight instruction " 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) The circumstances of departure must suggest " ' "a purpose to avoid being observed or arrested." ' " (*Ibid.*) However, the prosecution "need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) The sole fact that a defendant left the scene of the crime may be sufficient evidence for a flight instruction; it is for a jury to determine the significance of the departure. (*People v. Turner* (1990) 50 Cal.3d 668, 694.) The evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

"An instruction in substantially [the] form [of CALCRIM No. 372] *must* be given whenever the prosecution relies on evidence of flight to show consciousness of guilt. (§ 1127c.) A flight instruction is proper whenever evidence of the circumstances of

---

**3** Defendant did not object to the instruction below or to the prosecution's closing argument. In anticipation of us finding the issue forfeited, defendant also claims if this failure to object resulted in forfeiture of the issue on appeal, counsel was ineffective. Accordingly, we address the claim on the merits.

6

defendant's departure from the crime scene or his usual environs, or of his escape from custody after arrest, logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner, supra*, 50 Cal.3d at p. 694, fns. omitted.) It is not the introduction of evidence that might be construed as flight, but rather the prosecution's reliance on such evidence to prove guilt, that triggers the duty to instruct on flight. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 367.)

The evidence in this case, and the prosecution's reliance on that evidence to show consciousness of guilt, support giving the instruction. Both Angelina and her mother testified defendant ran from the shed upon the mother's arrival. Neither testified that Eric assaulted defendant before defendant fled. The prosecution's theory that defendant fled because he was found in a shed with a 12-year-old girl whom he had just sexually assaulted was not an unreasonable inference from the evidence. Put another way, the jury could reasonably infer defendant's flight from the scene demonstrated guilty knowledge. Although Eric's testimony that he tried to put defendant through the back wall of the shed offered another possible, innocent, explanation for defendant's flight, that evidence was for the jury to weigh. (See *People v. Richardson, supra*, 43 Cal.4th at p. 1020 ["The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence"].) It was up to the jury whether to believe this testimony, and to decide whether it was the reason for defendant's flight from the scene. "The jury could attribute an innocent explanation to his conduct, but it could also infer that his departure and the circumstances thereof were consistent with and supported the prosecution's theory. . . . Consequently, it was not error to give a flight instruction." (*People v. Bonilla, supra*, 41 Cal.4th at p. 329.) As we have found no error in the instruction, we need not address defendant's additional claims.

7

## II

### *Expert Testimony*

Defendant contends the trial court abused its discretion by allowing admission of expert testimony about CSAAS. He argues that despite the limiting instruction on the use of this evidence, there was a substantial danger the jury would consider the expert testimony "about CSAAS as supporting Angelina's claims of abuse despite her changing version of events and credibility problems." He argues any probative value was outweighed by the prejudicial effect of the evidence, particularly given that Angelina had "demonstrated credibility problems." Defendant also claims the trial court erred in permitting the expert to testify as to case-specific information regarding the impact of mental health problems on the behavior of sexually abused children. Lastly, defendant contends the trial court denied his constitutional right to effectively cross-examine Love by denying his requests for an Evidence Code section 402 hearing (402 hearing) and access to Angelina's mental health records.

### *Background*

In motions in limine, the prosecution sought to introduce expert testimony from Love to explain CSAAS to address Angelina's delayed and inconsistent recitation of the incident and her sporadic recantation of the claims. In response, defense counsel requested a 402 hearing "prior to [Love] being called as a witness." At the hearing on the motions, after the trial court indicated it would permit Love to testify as to CSAAS with a limiting instruction, defense counsel asked if the trial court was denying the request for a 402 hearing. The prosecution assured the trial court that Love's testimony would be consistent with the testimony the court had previously heard from Love in other matters, a general conversation about CSAAS, that Love had no personal or professional opinion about the veracity of the allegations, and Love had not conducted any interviews in the case. The prosecution also provided defense counsel with a chart of the components of CSAAS indicating the general topics that would be discussed. Accordingly, the trial

court denied the request. Prior to testimony commencing, defense counsel made another motion seeking access to Angelina's mental health records. The trial court reviewed the records and denied the request to release the records. The trial court found there was no information in the records about false reports or accusations, false ideation, fantasies, delusions, hallucinations, or perceptual disorders. There was no information about the alleged offense and no mention of defendant. Accordingly, the trial court found the records were not relevant to any issue in the case.

During trial, prior to Love's testimony, defense counsel also objected to Love's expected testimony on CSAAS, arguing CSAAS was developed in a clinical setting of intrafamilial sexual abuse and was therefore not applicable to the facts of this case. Defense counsel also reiterated her request for a 402 hearing to see what the evidence was "limited to and see how it applies to this case and what he can testify to." The trial court denied the motion, stating the parties had discussed the issue earlier, the prosecution had provided a chart with the information that would be testified to, and the prosecutor again confirmed Love had no personal involvement with the case, had not read reports or talked to any witnesses, and would only testify about CSAAS in general terms.

Prior to Love's testimony, the trial court instructed the jury with CALCRIM No. 1193, as follows:

"So here's the instruction. Because there's going to be testimony about a syndrome. It's called the Child Sex Abuse Accommodation Syndrome, and it's three paragraphs, and they're pretty brief. So let's read 'em. And by the time I read this, you will have heard the testimony. [¶] So it reads: 'You have heard testimony from David Love regarding Child Sex Abuse Accommodation Syndrome,' okay, paragraph one. Paragraph two, which is important, 'This testimony about Child Sex Abuse Accommodation Syndrome is not evidence'—okay. What do you mean—'is not evidence that the defendant committed any of the crimes alleged against him.' [¶] I'm

9

informed or believe Mr. Love knows nothing about this case, hasn't talked to anybody, hasn't been informed, hasn't read anything, doesn't know anything. So he's not here to give you any opinion about guilt or innocence, okay. [¶] The last line is this, and this is all—this is all based on the law: 'You may consider this evidence'—well, what evidence – 'Child Sex Abuse Accommodation Syndrome only as follows'—in two ways, and one's worded a little funny, but bear with me—'in deciding'—uh-huh—'whether or not the alleged victim's conduct'—okay—'in deciding whether or not the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested,' that's one. And, 'Two, in evaluating the believability of the alleged victim's testimony.' That's what it's for."

Love testified that CSAAS is a clinical study that examines the typical reactions of children who have been sexually molested. The purpose of the study was to create a tool for various professionals who work with children who have been molested. It is not a diagnostic tool and cannot be used to determine whether sexual molestation occurred. The study found five components that children tend to experience when they have been molested, which include secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction.

The prosecutor asked Love about the impact of mental health diagnoses, such as bipolar or manic depression disorders, on the secrecy component. Love responded that children with these diagnoses may have difficulty regulating emotions and have inappropriate bonding and attachment with others, including not having appropriate boundaries with strangers. Such a diagnosis could increase the secrecy component. In addition, Love testified mental health issues can impact cognition and decisionmaking, and as to the helplessness component such diagnoses may make these children more vulnerable and emotionally needy.

Love also testified he had never interviewed Angelina or read any reports on this case. He had not made a diagnosis, and none of his testimony could be used to answer whether Angelina had been molested.

After the direct examination of Love, defense counsel stated her objection to Love's testimony regarding mental health diagnosis. She indicated she had wanted a 402 hearing to limit the testimony and to prevent the prosecution from seeking inadmissible testimony. She argued it was inappropriate to elicit the testimony regarding mental health, in part because she had not received discovery of the relationship between mental health problems and CSAAS. The trial court found the testimony remained generic and refused to strike the testimony. However, the trial court cautioned the prosecution from further examination on that point, specifically the impact of mental illness on the remaining components of CSAAS.

*Analysis*

### A. Admission of CSAAS Evidence

Defendant contends the trial court abused its discretion in admitting the CSAAS evidence as it was irrelevant and highly prejudicial. He contends the behavior described in the study is equally consistent with false testimony as with truthful testimony. He also argues this case is not a case of intrafamilial molestation to which this type of evidence is commonly applied. Lastly, he claims that even with the limiting instruction, the jury can easily misapply the testimony.

California courts have long recognized that expert testimony on CSAAS is admissible in child sexual abuse cases for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse. (See, e.g., *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 (*Perez*); *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947,

11

955-956.)  Although CSAAS testimony may not be used to prove that a child was molested, it is admissible "for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (*Patino,* at p. 1744.)  The prosecution does not have to identify the specific misconception to be addressed; it is sufficient if the victim's credibility is placed in issue due to paradoxical behavior, such as delay in reporting a molestation or in inconsistent statements.  (*Id.* at pp. 1744-1745; *Perez,* at p. 245.)

We reject defendant's assertion that CSAAS does not apply to this particular case. The CSAAS evidence admitted in this case was probative for its limited purpose.  It was used to rebut common misperceptions the jury may have held about how children react to being sexually abused.  Defense counsel asked the victim about her delay in reporting the abuse, and her inconsistent statements, including the new details in her trial testimony. CSAAS testimony is admissible to explain the victim's state of mind relative to those issues.  (*Patino, supra*, 26 Cal.App.4th at pp. 1745, 1747; see also *Perez, supra*, 182 Cal.App.4th at p. 245.)  Without the CSAAS evidence on delayed reporting, inconsistent statements and recantation, the jury could have concluded that the abuse did not occur simply because Angelina failed to report it immediately and continued to give inconsistent statements as to what occurred.  Defendant has not shown the probative value of the CSAAS evidence was lessened because this was a molestation by a stranger rather than a family member.

The evidence's probative value was not outweighed by its prejudicial impact.  The CSAAS evidence in this case was properly limited to the syndrome's characteristics, including delayed disclosure and inconsistencies.  Love testified that he was not familiar with the facts of this case.  He did not testify that Angelina was abused.  He did not testify she had a mental illness.  His testimony was limited to explaining the components of CSAAS.  We reject defendant's suggestion that the expert testimony invited the jury to conclude Angelina had been sexually abused in the manner she claimed.  In our view, no

12

reasonable juror would interpret Love's testimony as an expression of opinion on the ultimate question of whether Angelina had been sexually abused. (See *People v. Housley, supra*, 6 Cal.App.4th at pp. 955-956 [expert's testimony that he had never met victim, and was unfamiliar with particular facts of case, rendered it unlikely that jury would consider CSAAS testimony for improper purpose].) Moreover, the trial court instructed the jury on the limited use of the CSAAS evidence, including specifically instructing that CSAAS evidence was not evidence that defendant committed any of the crimes charged against him.

### B. *Love's Testimony Regarding Mental Illness*

Defendant also argues the trial court erred in allowing Love to testify as to case specific facts, specifically relative to the impact of diagnoses of bipolar or manic depressive disorder on the CSAAS components, which applied to bolster Angelina's credibility. Although asking about specific mental illness diagnoses did get close to the line of proper inquiry, we reject defendant's claim that the testimony elicited was so case specific as to render it unduly prejudicial. Rather, Love's testimony remained generalized statements and observations about the impact of those mental illnesses on the components of CSAAS, specifically secrecy and helplessness. As such, the testimony remained within the limitations of "observations concerning the behavior of abused children as a class and [] avoid[ed] testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384.) Love explicitly acknowledged that he had neither met Angelina nor reviewed any of the reports in this case. The jurors were repeatedly instructed they could only use Love's testimony to understand seemingly counterintuitive behavior when evaluating Angelina's believability. The trial court did not abuse its discretion in admitting this evidence.

### C. *Evidence Code Section 402 Hearing and Psychiatric Records*

Defendant's last complaint relative to this expert testimony is that the trial court denied his right to effectively cross-examine Love by denying his requests for a 402

13

hearing and denying him access to Angelina's mental health records to prepare to cross-examine Love. He argues as a result of these abuses of discretion, he was "blindsided" by Love's testimony regarding mental illness and access to Angelina's mental health records would have permitted him to effectively cross-examine Love.

It is unsettled whether the "right of confrontation embraces a right to discover information necessary to make cross-examination effective." (*People v. Abel* (2012) 53 Cal.4th 891, 931 (*Abel*), citing *People v. Gurule* (2002) 28 Cal.4th 557, 592 (*Gurule*).) The "right to confrontation [articulated in the Sixth Amendment] is a *trial right*, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. . . . The ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1126 (*Hammon*), quoting *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 52-53 (*Ritchie*) (opn. of Powell, J., concurred in by Rehnquist, C.J., White and O'Connor, JJ.).)

As *Hammon* notes, only four justices agreed on this point. Three justices concluded there were circumstances in which a pretrial denial could violate the confrontation clause, and two justices expressed no view on this point. (*Hammon*, *supra*, 15 Cal.4th at p. 1126.) In light of divided views of the Supreme Court, "it is not at all clear 'whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused.' " (*Ibid*.) Denial of a defendant's request to examine the confidential psychiatric records of a critical prosecution witness for purposes of impeachment does, however, "implicate the fundamental fairness of trials and [is] therefore subject to analysis under the due process clause of the Fourteenth Amendment to the United States Constitution." (*Abel, supra*, 53 Cal.4th at p. 931; *Richie, supra*, 480 U.S at p. 56.)

The mental illness or emotional instability of a witness can be the subject of cross-examination of the witness "if such illness affects the witness's ability to perceive, recall

14

or describe the events in question." (*Gurule, supra*, 28 Cal.4th at p. 592.) When a criminal defendant seeks, for purposes of impeachment, information otherwise protected by state law evidentiary privileges, such as the disclosure of private records, medical or otherwise related to care and treatment, the trial court must "balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*Hammon, supra*, 15 Cal.4th at p. 1127; *Davis v. Superior Court* (1992) 7 Cal.App.4th 1008, 1018-1019.)

In this context, the trial court has a "duty to review the documents and to determine which, if any, are material and should be disclosed." (*People v. Martinez* (2009) 47 Cal.4th 399, 453.) " '[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Ritchie, supra*, 480 U.S. at p. 57; *Abel, supra*, 53 Cal.4th at p. 931.) "We also consider any adverse effect nondisclosure might have had on counsel's investigations and trial strategy." (*Abel,* at p. 931.)

The purpose of a 402 hearing is to decide preliminary questions of fact upon which the admissibility of evidence depends. (*People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 209, fn. 6.) CSAAS testimony has long been admissible evidence. The trial court was familiar with Love, the nature of the testimony to be offered by him, and its admissibility. The parties discussed the testimony and the prosecution provided defense counsel with a graphic of the topics to be discussed by Love. The prosecution assured the trial court Love did not have, and would not testify to, any specific knowledge about Angelina or the specific facts of this case. Although Love's testimony ultimately went slightly beyond the prosecution's proffer, given this record, it was not an abuse of discretion for the trial court to deny defendant's request for a 402 hearing. (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 704.)

15

The trial court conducted an in-camera review of Angelina's mental health records and found they contained no information relevant to any issue in the case. (See *People v. Webb* (1993) 6 Cal.4th 494, 518.) Defendant does not argue the trial court erred in making this ruling as to cross-examining Angelina, the context in which the trial court was asked to review the records' materiality. The records do not contain information that suggests a mental illness or instability that would have affected Angelina's ability to perceive, recall, or describe the events in question. (*Gurule, supra*, 28 Cal.4th at p. 592.) The trial court was not asked to reconsider this ruling in light of Love's testimony. Accordingly, as to this point, the claim is forfeited. Moreover, denial of these records did not "deprive[] [defendant] of information he could use to cross-examine" Love. (*Abel, supra*, 53 Cal.4th at pp. 930-931; *Hammon, supra*, 15 Cal.4th at p. 1127.) Love had not reviewed the records, had no information about what was in the records, had no specific information regarding Angelina's mental health diagnoses, and did not testify on any of these points.

Further, although defense counsel may not have expected Love to testify as to the effect of mental illness on the CSAAS components, this unexpected testimony did not hinder counsel's ability to cross-examine Love. Defense counsel was aware well before trial that Angelina had been diagnosed with bipolar/manic depressive disorder. She also knew this information well before Love's testimony. Moreover, as discussed *ante,* Love's testimony as to the impact of mental illness on the syndrome components was generalized and not specific to Angelina's diagnosis or treatment. It could not have been specific, as Love had no information about Angelina or this case specifically. As such, granting a 402 hearing and permitting examination of Angelina's mental health records could not have resulted in a more effective cross-examination of Love. We find no abuse of discretion in the trial court's rulings and the rulings did not infringe upon defendant's right to effectively cross-examine Love.

16

## III

Defendant contends the trial court erred in imposing a $500 fine under section 294. The People properly concede this point. Under section 294, the trial court may impose a restitution fine when a defendant is convicted of an enumerated offense against a minor under 14 years old. (§ 294, subds. (a) & (b).) Section 288 is not one of the enumerated offenses. Accordingly, ordering defendant to pay that fine was unauthorized.

## DISPOSITION

We modify the judgment to strike the fine under section 294. In all other respects, we affirm the judgment.

/s/
BLEASE, J.

We concur:

/s/
RAYE, P. J.

/s/
RENNER, J.

17