Filed 6/15/22  P. v. Fregoso CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO ALONSO FREGOSO,<br><br>    Defendant and Appellant. | 2d Crim. No. B306325<br>(Super. Ct. No. 2013012256)<br>(Ventura County) |

Gustavo Alonso Fregoso appeals the judgment entered after a jury convicted him of committing sodomy on a child under the age of 11 (Pen. Code,[1] § 288.7, subd. (a)).  The trial court sentenced appellant to 25 years to life in state prison and ordered him to pay fines, fees and assessments including a $10,000 restitution fine (§ 1202.4, subd. (b)), a $40 court facilities assessment (§ 1465.8, subd. (a)(1)), a $30 court operations

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

assessment (Gov. Code, § 70373), and a $1,200 sex offender fine including related assessments (§ 290.3).

Appellant contends: (1) the court erred in denying his *Miranda*[2] motion; (2) the court erred by admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and by instructing the jury pursuant to CALCRIM No. 1193; (3) cumulative error compels the reversal of his conviction; and (4) the court erred in imposing the fines, fees and assessments without determining whether he had the ability to pay them, as contemplated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm.

## STATEMENT OF FACTS

### *Prosecution*

Appellant was convicted of sodomizing his niece L.C., who was eight years old when she testified at his trial. Beginning in 2012, when L.C. was six years old, she and her mother Maria (the sister of appellant's wife Enedelia Gaspar) often spent the night at her grandparents' house. L.C. slept in a bedroom with appellant, Gaspar, and their three-year-old son. Appellant slept in the same bed as L.C. and on numerous occasions put his hand on her vagina and touched her vagina and buttocks with his penis. Appellant had also put his penis in her anus several times when she was five or six years old.

In January 2013, L.C. told Maria about the abuse. L.C. told Maria she did not come to her earlier or scream out during the incidents because she was afraid. Maria confronted Gaspar about the allegations but waited three months to go to the police because she was confused and conflicted about the situation.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

2

On April 16, 2013, L.C. was interviewed by Oxnard Police Detective Erica Escalante.  A recording of the interview was played at trial.  L.C. told the detective that on numerous occasions appellant had grabbed her, pulled her onto the bed, pulled down her underwear, and put his penis in her anus.  L.C. was also examined by a sexual assault nurse examiner who determined that L.C.'s anus was "open beyond normal" and had scar tissue indicating she had been anally penetrated multiple times over an extended period.

After L.C. was interviewed and examined, Detective Escalante and Detective Luis McArthur, a certified Spanish interpreter, went to appellant's house and asked him to come to the police station to talk to them.  Appellant subsequently met the detectives at the station and was interviewed for approximately three hours.  He initially denied the accusations made by L.C.  Detective McArthur said that with appellant's permission they would obtain a DNA sample from him and would compare his DNA with DNA allegedly found in or near L.C.'s anus.  Appellant eventually admitted an incident when he sodomized L.C., but claimed that L.C. had grabbed his penis and forced it into her anus.  After appellant was arrested and given *Miranda* advisements, he repeated his prior remarks about sodomizing L.C.

Dr. Jody Ward, a clinical and forensic psychologist, testified as an expert regarding Child Sexual Abuse Accommodation Syndrome (CSAAS).  The five components of CSAAS are secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation. Secrecy could be due to shame or fear that reporting the abuse would break up the family.  It is also not unusual for a victim to refrain

3

from crying out for help even if other people were nearby. Regarding entrapment and accommodation, it may appear that a victim is a willing participant in the abuse because children may acquiesce in the abuse to meet their emotional needs or protect their siblings. Moreover, two-thirds of child victims of sexual abuse do not report the abuse until adulthood, while many never report the abuse. Where abuse took place over a long period of time, it is common for victims to have difficulty separating out specifics instances or details of the abuse.

## *Defense*

Gaspar testified that in late 2012 and early 2013 L.C. spent the night almost every weekend with appellant, Gaspar, and their son. The children slept on the bed and appellant and Gaspar slept on the floor in the same room. Gaspar, who characterized herself as a light sleeper, never noticed any odd behavior at night between appellant and L.C. Prior to the current allegations, Gaspar had never heard anyone else accuse appellant of acting inappropriately with children and Gaspar had never seen him doing so. Appellant's aunt and another relative who had known appellant since she was 13 years old also testified that they had never witnessed appellant behaving inappropriately toward children.

## DISCUSSION

## Miranda *Motion*

Appellant contends the trial court erred in denying his motion to exclude his extrajudicial statements to the police on the ground they were obtained in violation of his *Miranda* rights. We conclude otherwise.

*Miranda* dictates that individuals questioned by law enforcement after being "taken into custody" must first be

4

warned that they have the right to remain silent, that any statements they make may be used against them, and that they have a right to the presence of retained or appointed counsel. (*Miranda*, *supra*, 384 U.S. at p. 444.)  For the *Miranda* rule to apply, there must be an interrogation by the police while the suspect is in police custody.  (*Id.* at p. 478.)

Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323 [128 L.Ed.2d 293].)  "The question whether [the] defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)  "[A]n appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

"To determine whether an interrogation is custodial we consider a number of circumstances, including:  'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's

5

conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.'" (*People v. Torres* (2018) 25 Cal.App.5th 162, 172-173.)

Detectives Escalante and McArthur testified at the hearing on appellant's motion. The prosecution also offered a video recording and transcript of appellant's interview. At about 7:00 p.m. on April 16, 2013, the detectives went to appellant's residence to speak to him about the allegations L.C. had reported to the police earlier that day. Detective McArthur acted as a Spanish translator. The detectives told appellant they would like to speak to him at he police station about a "sensitive matter" but made clear he was not under arrest and was not obligated to go to the police station or answer any questions he did not want to answer. Appellant responded that he understood, drove to the police station with Gaspar and her mother shortly thereafter, and met up with the detectives in the parking lot.

Gaspar and her mother sat in the lobby while appellant accompanied the detectives to an interview room. Appellant was not handcuffed and the door to the room was left open during the entire interview, which lasted about three hours. Appellant was relaxed and calm throughout the interview, which was conducted entirely in Spanish, and was offered water and snacks. At the

6

outset of the interview, Detective McArthur reiterated that appellant was not in custody or under arrest and told him he was free to leave at any time. The detective also reiterated that appellant did not have to answer any questions he did not want to answer. If appellant had wanted to leave, the detectives would have guided him out of the police station.

Detective McArthur asked appellant why he thought he had been asked to speak with them at the police station. Appellant responded that he knew Maria had accused him of sexually abusing L.C. About 90 minutes into the interview, appellant admitted there had been some contact between his penis and L.C.'s buttocks but did not admit sodomizing her. After Detective McArthur told appellant that his DNA would probably be found on L.C., appellant began offering suggestions as to how his DNA might be found in or around L.C.'s anus. He claimed that he may have accidentally touched L.C. with his erect penis while they were sleeping.

Detective McArthur asked appellant if he would voluntarily provide a cheek swab to compare his DNA to DNA allegedly found during L.C.'s medical exam. Appellant asked if he was going to be arrested. The detective replied that appellant would have the opportunity to explain if the DNA test came back positive. After appellant voluntarily provided a buccal swab, Detective Escalante took the swab and left for about 15 minutes. The detective subsequently engaged in a ruse by returning with a purported test result falsely showing that appellant's DNA was found in L.C.'s anus.

Appellant subsequently admitted an incident when he sodomized L.C. After he was arrested and given *Miranda*

advisements, he repeated his prior remarks about sodomizing L.C.

The court did not err in denying appellant's motion to exclude his statements to Detectives Escalante and McArthur. Appellant came to the police station voluntarily and was repeatedly told he was not under arrest and was free to leave. The door was left open throughout the interview and only two detectives were present. On one occasion, appellant left the interview room to use the bathroom. Moreover, the detectives' statements and demeanor throughout the interview were not aggressive, confrontational, or accusatory. (Compare, e.g., *People. v. Saldana* (2018) 19 Cal.App.5th 432, 458-459 [defendant was in custody where, among other things, detectives "were aggressive, confrontational and accusatory" and communicated a "resolute belief" that he committed the crime]; *People v. Torres*, *supra*, 25 Cal.App.5th at p. 176 [defendant was in custody where "the detectives dominated and controlled the course of the interrogation" and "ask[ed] confrontational and accusatory leading questions"].)

Although appellant notes that he asked if he could leave after he provided a buccal swab and that the detectives' response suggested he would have to wait approximately 10 minutes for them to receive the results, the detectives also repeatedly made clear that appellant did not have to provide a buccal swab if he did not want to do so. (Compare *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1105 [defendant was not free to leave and thus in custody when police "demanded" his phone and indicated he could not leave until data was retrieved].) Moreover, appellant made incriminating statements before he was asked to provide a buccal swab. We are also unpersuaded by appellant's complaint

that the detectives falsely told him they had found his DNA in L.C.'s anus. "'The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' [Citation.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 165.) Appellant makes no such showing here.

We also reject appellant's claim that the incriminating statements he made *after* he was given *Miranda* warnings were obtained through an unconstitutional two-step interrogation, in violation of *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643] (*Seibert*). Appellant did not raise this claim below so it is forfeited. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1170.) In any event, *Seibert* prohibits law enforcement officers from employing a deliberate two-step interrogation technique where they elicit a confession, administer *Miranda* warnings and obtain a waiver of *Miranda* rights, then elicit a repeated confession. (*Seibert*, at pp. 604, 609-610, plur. opn. of Souter, J.; *id.* at p. 622, conc. opn. of Kennedy, J.) *Seibert*, however, involved *Miranda* warnings delivered in the midst of a custodial interview. (*Id.* at p. 604, plur. opn.) Moreover, *Seibert* only applies when the police have deliberately and intentionally sought to circumvent *Miranda*. (See *People v. Rios* (2009) 179 Cal.App.4th 491, 504-505.) Because appellant makes no such showing here, his reliance on *Seibert* is misplaced.

Even if appellant's statements should have been excluded, the error would be harmless. L.C. testified that appellant had repeatedly sodomized her, and she has scar tissue indicating multiple anal penetrations over an extended period of time. In light of this evidence, any error in admitting appellant's statements was harmless beyond a reasonable doubt. (*Chapman*

9

*v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]; *People v. Neal* (2003) 31 Cal.4th 63, 86 [applying *Chapman* harmless error standard of review to *Miranda* violation].)

### CSAAS Testimony

Appellant contends the trial court erred in admitting Dr. Ward's testimony on CSAAS. He asserts that the testimony was "irrelevant to the issues in [the] case and is unreliable 'scientific' evidence that is not generally accepted by the scientific community." He also claims that the evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative. We are not persuaded.

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our Supreme Court approved of the decisions of Courts of Appeal holding that CSAAS testimony is admissible for some purposes. (*Id.* at p. 1300.) *McAlpin* was followed by *People v. Brown* (2004) 33 Cal.4th 892 (*Brown*), which upheld the use of expert testimony on battered women's syndrome based on similar reasoning. (*Brown*, at pp. 905-907.) It is now well-settled that CSAAS evidence is admissible for the limited purposes for which it is admitted in this case. (*McAlpin*, at pp. 1300-1301; see also *People v. Munch* (2020) 52 Cal.App.5th 464, 468; *People v. Perez* (2010) 182 Cal.App.4th 231, 243-245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1102 (*Sandoval*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 390-394 (*Bowker*).) We are also clearly bound to follow *McAlpin* and *Brown*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Munch*, at p. 468.) As we recently recognized, the *Kelly/Frye* test (which applies to expert testimony based on a new scientific technique) "'does not apply to this type of evidence.' [Citations.]" (*Munch*, at p. 473.)

10

Accordingly, the trial court's decision to admit expert testimony on CSAAS "'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'" (*McAlpin*, at p. 1299.)

While CSAAS testimony is inadmissible to prove that a molestation occurred, it is nevertheless admissible as to the alleged victim's "'credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.'" (*Sandoval*, *supra*, 164 Cal.App.4th at p. 1001, quoting *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) CSAAS evidence has been held admissible "'"to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior . . . ."'" (*Sandoval*, at p. 1002, quoting *McAlpin*, at p. 1301.) "'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. In the typical criminal case . . . , it is the People's burden to identify the myth or misconception the evidence is designed to rebut.'" (*Sandoval*, at p. 1002, quoting *Bowker*, supra, 203 Cal.App.3d at p. 394.)

"Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.) That was plainly the case here. In cross-examining the sexual assault nurse who examined L.C., defense counsel

11

asked if the claimed abuse would cause a great deal of pain and whether such pain "would be accompanied by crying or screaming of some sort." In cross-examining Escalante, defense counsel asked "[d]id strike you as odd that" appellant could have molested L.C. in such a small room while Gaspar was present. Defense counsel also elicited Escalante's testimony that the alleged acts took place between November 2012 and January 2013, yet they were not reported until April 2013. It is thus clear that "the victim's credibility [was] placed in issue due to . . . paradoxical behavior." (*Patino*, at pp. 1744-1745.)

### CALCRIM No. 1193

Appellant also contends that the court erred in instructing the jury pursuant to CALCRIM No. 1193 because the instruction misstates the law and reduced the prosecution's burden of proof. We have previously rejected this contention. (See *Munch*, *supra*, 52 Cal.App.5th at p. 474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)

In *Munch*, the defendant claimed that CALCRIM No. 1193 "'effectively instructs the jury that they may take [the expert's] testimony as evidence of the defendant's guilt'" because "instructing jurors that they may use it 'in evaluating the believability' of the child's testimony means they will improperly use it to find the defendant is guilty." (*Munch*, *supra*, 52 Cal.App.5th at p. 474.) In rejecting this claim we reasoned that "'[t]he purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to

12

conclude [the child] was, in fact, molested.  The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.  There is no conflict in the instruction.'" (*Ibid.*, italics omitted, quoting *Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

Appellant offers nothing to persuade us that *Munch* and *Gonzales* were incorrectly decided on this point.  Accordingly, we follow our previous holdings that CALCRIM No. 1193 is a correct statement of the law and sufficiently advises the jury that CSAAS evidence may not be used to prove that the defendant committed any of the charged crimes.

### Cumulative Error

Appellant contends that the cumulative effect of the alleged errors compels reversal of the judgment.  Because we reject each assignment of error, appellant's claim of cumulative error necessarily fails.  (*People v. Avila* (2006) 38 Cal.4th 491, 608.)

### Dueñas

Appellant contends the court erred in imposing a $10,000 restitution fine (§ 1202.4, subd. (b)), a $40 court facilities assessment (§ 1465.8, subd. (a)(1)), a $30 court operations assessment (Gov. Code, § 70373), and a $1,200 sex offender fine including related assessments (§ 290.3) without determining whether he had the ability to pay as contemplated in *Dueñas*, *supra*,  30 Cal.App.5th 1157.  We are not persuaded.

In *Dueñas*, the court concluded that "due process of law requires the trial court to conduct an ability to pay hearing and

13

ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The court also concluded that "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

With respect to appellant's $10,000 restitution fine, the trial court had the authority, even before *Dueñas*, to "consider[ ]" the defendant's "[i]nability to pay" whenever it "increase[ed] the amount of the restitution fine" in excess of the $300 minimum. (§ 1202.4, subds. (b)(1), (c).) The $1,200 sex offender fine and related assessments also contemplate a finding regarding the defendant's ability to pay. (§ 290.3) When a statute mandates a fine but requires the court to consider the defendant's ability to pay, the burden is on the defendant to object or demand a hearing to determine the ability to pay. (*People v. McMahan* (1992) 3 Cal.App.4th 740, 749-750.) At sentencing, appellant did not object or demand a hearing regarding his ability to pay the restitution or sex offender fines, so he forfeited his right to challenge those fines on appeal. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.) Because appellant failed to object to the restitution and sex offender fines by asserting an inability to pay, he also cannot be heard to complain that the court failed to consider his ability to pay the $40 court facilities and assessment

14

and the $30 court operations assessment. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

In any event, "*Dueñas* is distinguishable. That case involved a homeless probationer . . . who suffered from cerebral palsy and was unable to work. [Citation.]" (*People v. Johnson* (2019) 35 Cal.App.5th 134, 138.) Appellant, who was sentenced to prison, "is not similarly situated to the misdemeanor probationer in *Dueñas*. He was ordered to pay mandatory fees and a fine under the same constellation of statutes that were at issue in *Dueñas*, but there the similarity ends." (*Id.* at p. 139.) Appellant has the ability to earn wages while in prison. Any due process violation arising from the court's failure to consider appellant's ability to pay the court security fee and criminal conviction assessment was thus harmless beyond a reasonable doubt. (*Id.* at pp. 139-140 citing *Chapman v. California, supra,* 386 U.S. at p. 24.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P.J.          YEGAN, J.

15

Bruce A. Young, Judge
Superior Court County of Ventura

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.